## S10A0580. WHITE v. THE STATE.

(699 SE2d 291)

BENHAM, Justice.

Appellant Joseph White was convicted of and sentenced to life imprisonment for the malice murder of Nellie Mae Kirkland. He was also convicted of and sentenced for concealing the death of the victim and for tampering with evidence.[1] On appeal, he contends he was not afforded effective assistance of counsel, he challenges the sufficiency of the evidence and the removal of a juror during the trial, and he argues the trial court erred in its charge to the jury.

Shortly after 8:00 a.m. on July 10, 2005, a police officer found the nightgown-clad body of a woman lying face-down in a pool of blood in a parking area of a city park in southwest Atlanta. The forensic pathologist who performed the autopsy on the body testified she had suffered multiple blunt force trauma to her head, with the cause of death being strangulation. The body had post-mortem abrasions on her back, buttocks, heels, and right thigh, shoulder, wrist and hand, most likely inflicted when she was dragged by the feet and by the wrists or underarms to the site where she was found. Between 8:00-8:30 that same morning, appellant Joseph White telephoned the daughter of Nellie Mae Kirkland, the woman he lived with in southwest Atlanta, and reported that Ms. Kirkland was not at her home but her purse and vehicle were there. The daughter called police to report her mother was missing and went to her mother's home, one-tenth of a mile from the park in which the woman's body had been found.

The homicide unit commander of the Atlanta Police Department testified that at about noon on July 10 he was approaching the site where the dead woman's body had been found, and appellant flagged him down to report that his girlfriend was missing. A detective who

---

[1] The crimes took place the night of July 9-10, 2005, and appellant was arrested on July 10. On September 30, 2005, the Fulton County grand jury returned a true bill of indictment charging appellant with malice murder, felony murder (aggravated assault), aggravated assault, aggravated battery, concealing the death of another, and tampering with evidence. Appellant's trial commenced on June 16, 2006, and concluded with the trial court's direction of a verdict of not guilty on the aggravated battery charge and the jury's return of guilty verdicts on the remaining counts on June 23. Filed on June 27, 2006, was the trial court's imposition of a life sentence for malice murder, a consecutive sentence of ten years for concealing the death of another, and a three-year sentence for tampering with evidence, to be served concurrently with the ten-year sentence. A motion for new trial, filed on July 17, 2006, and amended on July 7, 2009, was the subject of a hearing held on July 10, 2009. The amended motion for new trial was denied on November 17, 2009. Appellant filed a notice of appeal on August 7, 2009, from the trial court's oral order denying the amended motion for new trial, and an amended notice of appeal on December 8, 2009, following the entry of the written order denying the amended motion for new trial. The appeal was docketed to the January 2010 Term of this Court when the appellate record was filed in this Court. It was submitted for decision on the briefs.

was investigating the homicide came to the home of the missing woman after being contacted by the missing woman's daughter, who feared her mother was the woman found in the park. The detective and the missing woman's son walked through the tidy home and found the victim's walking cane and purse, and the detective noticed what appeared to be blood on appellant's calf. The missing woman's son took a photograph of his mother to the county morgue where the woman found in the park was identified as being Ms. Kirkland. Police executed a search warrant at the victim's home and discovered blood-soaked sheets, pillows, and mattress on a bed that had been made, and blood on a leg of a nightstand and on a cardboard box in the bedroom. When the searching officers lifted the mattress, they found a knife lodged in the center of the bed between the mattress and box springs. Found in the backseat of the patrol car used to transport appellant to police offices were two cardboard scraps from the box in the bedroom, which scraps contained blood determined to be that of the victim.

The victim's children testified their mother had told them she planned to have appellant leave her home because he had resumed using illegal drugs and she feared him and his bizarre behavior. The victim had made arrangements for one of her children to change the locks on the victim's home when appellant next left for work. An acquaintance of appellant testified that between 8:00-9:00 a.m. on July 10, appellant, with a few scratches on his hands, visited her home where he bought and consumed alcoholic beverages.

Appellant testified he had spent July 9 smoking crack cocaine and drinking wine and beer, and the victim had realized how he had spent the day when she returned home at 9:00 p.m. While the two were in a bedroom, the victim berated appellant about his behavior, mentioned her regret at having recently made a $4,000 down payment on the vehicle he used, and then slapped him, pushed him down on the bed, and jumped on him. He was able to get her off him, at which point the victim swung at him with a knife, and he pushed her, causing her to strike her face on the nightstand. According to appellant, the victim stood up and went into the kitchen, leaving appellant in the bedroom. Fifteen minutes later, appellant found her on the kitchen floor and, believing her to be dead, left the house. He returned 30-40 minutes later, found her in the same place he had left her, and dragged her body from the house to the park, falling down the six front steps of the house and causing the victim's head to repeatedly hit the steps. He returned to the house, cleaned up, and called the victim's daughter and asked where her mother was.

1. Appellant contends the evidence presented by the State was not sufficient to support the jury's guilty verdicts.

(a) Appellant's concerns about the jury's guilty verdicts for

felony murder/aggravated assault and aggravated assault are moot since the felony murder conviction was vacated by operation of law (*Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993)), and the trial court found the aggravated assault conviction to have merged into the malice murder conviction as a matter of fact. OCGA § 16-1-7 (a). See *Joachim v. State*, 263 Ga. 816 (2) (440 SE2d 15) (1994).

(b) Appellant argues the evidence did not establish the legal malice necessary to authorize a conviction on malice murder and did not disprove appellant's contention he acted in self-defense.

> [I]n Georgia, the crime of malice murder is committed when the evidence shows either an express or, in the alternative, an implied intent to commit an unlawful homicide. . . . Thus, a malice murder can be shown not only by evidence that the defendant acted with the "deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof," but also by evidence that the defendant acted "where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." OCGA § 16-5-1 (b). In other words, evidence that the defendant acted with implied malice is, for purposes of demonstrating his guilt of the crime of malice murder, no less probative than proof that he acted with specific intent to kill. . . . "[I]mplied malice," as employed in OCGA § 16-5-1 (b), is "a term which has been defined to mean conduct exhibiting a 'reckless disregard for human life.' [Cits.]"

*Parker v. State*, 270 Ga. 256 (4) (507 SE2d 744) (1998). As stated earlier, there was testimony that the victim was going to require appellant to move out of her house because of his bizarre behavior brought about by his drug usage. It is for a jury to determine from all the facts and circumstances whether a killing is intentional and malicious (*Oliver v. State*, 276 Ga. 665 (1) (581 SE2d 538) (2003)), and there was evidence to support the jury's verdict. Likewise, the issues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense. *Webb v. State*, 284 Ga. 122 (1) (663 SE2d 690) (2008). A detective testified that the knife was found between the mattress and box springs in the middle of the bed only after officers had removed the mattress, and that the knife did not become a factor in appellant's version of events until after the detective told appellant of its discovery. The evidence was sufficient to authorize the jury to conclude appellant did not act in self-defense.

Appellant also asserts the trier of fact could not arbitrarily reject his testimony since he was an unimpeached witness whose testimony was not contradicted, incredible, impossible, or inherently improbable. See *Tate v. State*, 264 Ga. 53, 59 (440 SE2d 646) (1994) (Carley, J., dissenting). In affirming the trial court's grant of a motion to suppress (and reversing the Court of Appeals's reversal thereof), the majority in *Tate* (264 Ga. at 56) ruled that a "trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony[,]" noting that

a rational trier of fact can choose to reject even "undisputed" testimony if that factfinder believes that witness's testimony to be unreliable. Factors such as demeanor, contradictory or inconsistent statements and evidence that [a witness] had "ulterior motives" can all lead a trier of fact to disregard testimony. . . .

Id. at n. 5. Even if we assume for the sake of argument that the rule cited in the *Tate* dissent remains viable in criminal cases in which the unimpeached and uncontradicted testimony is presented by the defense (see *Agnor on Georgia Evidence*, Sec. 18:6 (4th ed.) and *State v. Hester*, 268 Ga. App. 501, 505, n. 13 (602 SE2d 271) (2004), suggesting such a possibility), appellant does not meet the initial criterion for application of the rule since he was impeached by his prior inconsistent statements concerning the cause of the victim's death and his knowledge of her whereabouts. See *State v. Brown*, 278 Ga. App. 457, 460-461 (629 SE2d 123) (2006).

(c) Pointing out that had the victim's body been left in the bedroom of her home it would have been discovered at a later time on July 10 than when the body was discovered in the park, appellant concludes that the evidence was not sufficient to authorize his conviction for concealing the death of another. OCGA § 16-10-31 makes criminal a person's conduct when that person hinders the discovery of whether or not another person was unlawfully killed by concealing the death of the other person. *Phelps v. State*, 278 Ga. 402 (2) (603 SE2d 236) (2004). By telling the victim's children and police that the victim was missing when he knew where the victim was and that she was dead, appellant hindered the discovery of whether Ms. Kirkland had been unlawfully killed. See *Crawford v. State*, 267 Ga. 881, 882 (485 SE2d 461) (1997). By removing Ms. Kirkland's body from the site where she was killed, thereby hindering the discovery that Ms. Kirkland was dead, appellant hindered the discovery of whether Ms. Kirkland had been unlawfully killed. See *Mitchell v. State*, 274 Ga. 768 (1) (560 SE2d 8) (2002). That an unidentified deceased person's body was found nearby before the police or Ms.

Kirkland's children were aware Ms. Kirkland was dead does not take away from the fact that appellant concealed her death when he hindered discovery of the facts that Ms. Kirkland was dead and was the victim of an unlawful homicide. See *Duncan v. State*, 283 Ga. 584 (1) (662 SE2d 122) (2008).

(d) "A person commits the offense of tampering with evidence when, with the intent to prevent the apprehension . . . of any person or to obstruct the prosecution . . . of any person, he knowingly destroys, alters, conceals, or disguises physical evidence. . . ." OCGA § 16-10-94 (a). In light of appellant's admission that he "cleaned up a little bit" and the evidence that he concealed the bloody bedsheets and mattress by making the bed after removing the victim's body from the scene and concealed the scraps of bloody cardboard in the back seat of the patrol car, the evidence was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of tampering with evidence. See *Phillips v. State*, 242 Ga. App. 404 (503 SE2d 1) (2000). Compare *Merritt v. State*, 285 Ga. 778 (2) (683 SE2d 855) (2009) (the re-positioning of the victim's body and moving a pillow through which a gunshot was fired without evidence of why such actions were taken is insufficient evidence that appellant tampered with evidence). However, because appellant tampered with evidence in his own case and not to prevent the apprehension or prosecution of anyone other than himself, he was guilty of misdemeanor tampering and therefore could not receive a three-year sentence for commission of the crime. OCGA §§ 16-1-10; 16-10-94 (c);[2] *Perry v. State*, 283 Ga. App. 520 (2) (642 SE2d 141) (2007); *English v. State*, 282 Ga. App. 552 (3) (639 SE2d 551) (2006) (construing the phrase "involving another person" as used in the sentencing portion of OCGA § 16-10-94 to impose felony punishment "when the person commits the tampering offense involving the prosecution or defense of a third person," and requiring imposition

---

[2] OCGA § 16-1-10 provides that "[a]ny conduct that is made criminal by this title or by another statute of this state and for which punishment is not otherwise provided, shall be punished as for a misdemeanor."

OCGA § 16-10-94 (c) states:

Except as otherwise provided in this subsection, any person who violates subsection (a) of this Code section involving the prosecution or defense of a felony and involving another person shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than three years; provided, however, that any person who violates subsection (a) of this Code section involving the prosecution or defense of a serious violent felony as defined in subsection (a) of Code Section 17-10-6.1 and involving another person shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than ten years. Except as otherwise provided in this subsection, any person who violates subsection (a) of this Code section involving the prosecution or defense of a misdemeanor shall be guilty of a misdemeanor.

of misdemeanor punishment under OCGA § 16-1-10 for tampering in one's own felony prosecution). Accordingly, the three-year sentence imposed on appellant for tampering with evidence is vacated and the case remanded to the trial court for resentencing on that conviction.

2. Appellant takes issue with the trial court's removal of a juror upon the bailiff's report and the juror's admission that the juror had approached and engaged in conversation with a member of the victim's family during a break in the trial, in violation of the trial court's instructions.[3] The juror was identified as one who had arrived late for trial that morning and who had failed to inform the parties during voir dire that she had airline tickets for a family trip scheduled to take place mid-trial. While initially objecting to the anticipated removal of the juror, after discussing the circumstances with the trial judge and prosecutor, defense counsel stated her suspicion that the juror "created something because she really probably does want to be off this jury . . . [,]" at which point the trial court stated its belief that the interests of justice required the juror's removal. At the request of defense counsel, the juror was questioned about her contact with the family member, whether other jurors were aware of the contact, and whether she had conversed with her fellow jurors about her tardiness and her vacation plans that conflicted with the trial. The trial court then released the juror, at which time defense counsel sought a mistrial, not because the juror had been removed, but because defense counsel questioned the veracity of the juror's assurances that she had not spoken with her fellow jurors about the incidents. The trial court denied the motion, and the trial continued with one of the two alternates sitting as a juror.

Assuming that defense counsel did object to the removal of the juror, OCGA § 15-12-172 empowers a trial court to replace an "incapacitated" juror with an alternate upon good cause shown that the juror is unable to perform the juror's duty or is discharged for other legal cause. Appellant contends the trial court abused its discretion in removing the juror without evidence the unauthorized communication was harmful. While the content of the communication appears to have been innocuous, it is clear from the record that the prosecutor, defense counsel, and the trial judge all suspected the juror had acted deliberately when she approached the family member in violation of the trial court's instructions, in an effort to be

---

[3] The juror said she was smoking a cigarette and approached someone who also was smoking and talked about smoking. The conversation ceased when the other smoker informed her he/she could not speak with her. The juror then informed the bailiff of her contact with the family member.

removed from the jury. In exercising its discretion, the trial court relied on the act of disobeying its instructions and contacting a family member, the juror's tardiness that morning, and the juror's tardy disclosure to the court of her family's vacation plans that involved purchased airline tickets. The discharge of the juror "served the legally relevant purpose of preserving public respect for the integrity of the judicial process" (*Miller v. State*, 261 Ga. 679 (6) (410 SE2d 101) (1991) (punctuation omitted)), and appellant did not establish that the trial court abused its discretion by removing the juror. See *Brooks v. State*, 281 Ga. 14 (3) (635 SE2d 723) (2006) (counsel not ineffective for having failed to object to the trial court's removal of a juror due to tardiness); *Murray v. State*, 276 Ga. 396 (4) (578 SE2d 853) (2003) (juror removed for having an out-of-court communication despite juror stating it did not affect him).

3. Appellant contends the trial court violated *Edge v. State*, 261 Ga. 865 (414 SE2d 463) (1992), by giving an improper sequential charge in its instructions to the jury, and erred when it refused to give requested charges on involuntary manslaughter and on battery as an offense included in both aggravated battery and aggravated assault.

(a) The trial court gave an improper sequential charge when it instructed the jury to consider whether appellant was guilty of malice murder and felony murder before considering whether the defendant acted as a result of the provocation or passion that might authorize a verdict finding him guilty of voluntary manslaughter. However, the giving of an erroneous jury instruction must be harmful to warrant reversal of a judgment of conviction (*Foote v. State*, 265 Ga. 58 (2) (455 SE2d 579) (1995)), and there can be no harmful *Edge* violation when, as in the case before us, the jury finds the defendant guilty of malice murder. *Bellamy v. State*, 272 Ga. 157 (6) (527 SE2d 867) (2000).

(b) Even if we were to assume the trial court erred in failing to give the requested charge on battery, appellant cannot show harm from the trial court's inaction inasmuch as the trial court directed a verdict of acquittal on the aggravated battery charge and appellant's conviction for aggravated assault was merged as a matter of fact into the malice murder conviction. While appellant contends a conviction for battery in lieu of aggravated assault would have left the jury unable to find appellant guilty of felony murder and able to find, at most, appellant guilty of involuntary manslaughter, appellant fails to take into account the fact that the jury found appellant guilty of malice murder.

(c) Appellant requested a charge on misdemeanor involuntary manslaughter based on appellant's assertion he had acted lawfully when he pushed the victim and caused her to hit her head on the

nightstand. See OCGA § 16-5-3 (b). However, a defendant is not entitled to an instruction on misdemeanor lawful act/unlawful manner involuntary manslaughter when the defendant also seeks to justify the homicide under the "self-defense" statute because no crime is committed if the defendant was justified in killing and, if he was not justified, the homicide is not the "lawful act" required for misdemeanor involuntary manslaughter. *Saylors v. State*, 251 Ga. 735 (3) (309 SE2d 796) (1983). The contention on appeal that the trial court erred when it refused to give a charge on felony involuntary manslaughter (see OCGA § 16-5-3 (a)) is deemed waived for failure to object at trial to the failure to give such a charge.

4. Appellant next seeks reversal of his convictions due to the purported ineffective assistance of trial counsel. He asserts trial counsel was operating under an actual conflict of interest while representing appellant and takes issue with several of trial counsel's actions or failures to act.

> In order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that counsel performed deficiently and that the deficient performance prejudiced the defendant such that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different.

*Coleman v. State*, 286 Ga. 291 (6) (687 SE2d 427) (2009). If appellant fails to meet his burden of proving either prong of the test, the reviewing court need not examine whether the burden of proving the other prong has been met. *Fuller v. State*, 277 Ga. 505 (3) (591 SE2d 782) (2004). Where assistance of counsel has been denied entirely or during a critical stage of the proceeding, the defendant need not establish the *Strickland* prejudice prong because, in "circumstances of that magnitude," "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. . . . '[C]ircumstances of that magnitude' may also arise when the defendant's attorney actively represented conflicting interests." *Mickens v. Taylor*, 535 U. S. 162, 166 (122 SC 1237, 152 LE2d 291) (2002). The trial court's summary denial of appellant's motion for new trial raising each of the allegations of ineffective assistance raised on appeal contains no findings of fact with regard to the allegations of ineffective assistance of counsel.

(a) In the case before us, appellant bases a claim of ineffective assistance of counsel on an assertion that his counsel operated under an actual conflict of interest and maintains he need not establish the *Strickland* prejudice prong because he proved counsel labored under an actual conflict of interest that adversely affected counsel's per-

formance. See *Strickland v. Washington*, 466 U. S. 668, 692 (104 SC 2052, 80 LE2d 674) (1984); *Edwards v. Lewis*, 283 Ga. 345 (2) (658 SE2d 116) (2008). Appellant asserts trial counsel was operating under an actual conflict of interest that adversely affected counsel's performance when counsel purportedly failed to follow appellant's wish to enter a guilty plea to murder and receive a sentence of life imprisonment because the Office of Public Defender which employed trial counsel had a policy that precluded attorneys from entering a guilty plea that would result in a life sentence. As a result of going to trial, appellant received a sentence of life imprisonment plus 13 years. It is without question that it is the defendant, not his attorney, who, after being provided informed legal advice, makes the ultimate decision about whether or not to plead guilty. *Johnson v. State*, 276 Ga. 57 (4) (a) (573 SE2d 362) (2002).

At the hearing on appellant's motion for new trial, trial counsel testified about the office policy regarding guilty pleas in exchange for a sentence of life imprisonment[4] and that she had informed appellant when they discussed the plea offer that, based on the policy, she would have to withdraw as his counsel should he wish to proceed with entering a guilty plea. Counsel testified appellant had informed her he wanted to accept the plea deal offering life imprisonment, but he also wished to continue with trial counsel. Appellant testified at the post-trial hearing but was not questioned about the decision not to plead guilty and to proceed with a trial. At the post-trial hearing, the trial court proposed to reduce the sentence imposed on appellant to life imprisonment, but appellate counsel declined the offer.[5]

---

[4] Counsel testified the policy was still in effect as of the date of the hearing on the motion for new trial (July 10, 2009), and that she had learned post-trial that she could have gone over her supervisor's head to the office's director for a decision whether she could accept a plea offer of life imprisonment in exchange for a guilty plea to the murder charges.

[5] In response to the trial court's pre-trial inquiry concerning plea discussions, defense counsel stated in appellant's presence her office's policy not to accept a plea offer that results in a sentence of life imprisonment. The trial court immediately made it clear in appellant's presence that it was appellant's decision rather than counsel's office policy that governed, and reminded counsel appellant needed to be advised of the strength of the case against him and the possible sentences he faced. Counsel assured the trial court she had so advised her client and informed the court her client "has a defense that he wants to present." Appellant said nothing during this colloquy and went to trial where he was found guilty. At the sentencing hearing where the trial court imposed a sentence of life imprisonment plus 13 years, trial counsel reminded the court of "the inherent problem we face in being in a position of having to take this case to trial. We were never in a position where we did not want to resolve this, but because of the position that we were placed in[,] . . . the case was tried." After the trial court expressed frustration that no one took responsibility for what had happened to the victim, trial counsel stated, "[A]s far as the inherent position we were placed in, Mr. White did want to take responsibility, but as the court is aware [—] but our office has a policy that we couldn't allow that to happen. So that is why we had —." The trial court then responded: "Well, then we need to make that public that people can't — that your office is making decisions for people. It is your client's decision to make. Not your office." Trial counsel stated: "I understand that, Your

The question of whether an attorney labors under an actual conflict of interest for purposes of the Sixth Amendment generally arises when the purported conflict stems from the attorney's representation of multiple defendants concurrently. See *Mickens v. Taylor*, 535 U. S. at 174-176; *Cuyler v. Sullivan*, 446 U. S. 335, 350 (100 SC 1708, 64 LE2d 333) (1980).[6] This Court has also found a Sixth Amendment actual conflict to occur when the attorney's duty of loyalty to his client conflicts with the attorney's duty to the attorney's employer. *Edwards v. Lewis*, 283 Ga. 345, 350 (658 SE2d 116) (2008). See also *Sallie v. State*, 269 Ga. 446 (2) (499 SE2d 897) (1998) (actual conflict of interest arose where co-defense counsel served simultaneously as the law clerk for the judicial circuit in which his client was being tried). These cases have presented "circumstances of such magnitude" that the defendant was relieved of the responsibility of establishing that, but for counsel's deficient performance, the outcome of the proceeding would have been different because the likelihood was so high that the actual conflict of interest rendered the verdict or the outcome of the direct appeal unreliable. In such circumstances, to obtain relief, the defendant need only demonstrate that the conflict of interest existed and that it significantly affected counsel's performance. *Edwards v. Lewis*, supra, 283 Ga. 345 (grant of habeas relief); *Sallie v. State*, supra, 269 Ga. 446 (2) (grant of new trial).

In the case at bar, appellant demonstrated an actual conflict of interest under *Edwards v. Lewis* by establishing that counsel's duty of loyalty to her client was in conflict with her duty of loyalty to her employer, and that counsel's performance was adversely affected thereby in that counsel declined to pursue appellant's desire to enter a guilty plea in exchange for a sentence of life imprisonment. In this case, however, counsel's actual conflict did not render the verdict unreliable since appellant wished to plead guilty and the jury trial resulted in a guilty verdict. The prejudicial effect of counsel's conflict in this case is limited to the 13 additional years appellant was sentenced to serve following the jury's verdicts that he would not have had to serve had he entered the guilty plea he would have entered but for counsel's actual conflict of interest. The trial court recognized the available remedy — to modify appellant's sentence to

---

Honor. And that was explained to Mr. White, . . . that he had the opportunity to seek other counsel if he no longer wanted our office."

[6] In *Mickens v. Taylor*, supra, 535 U. S. at 174-176, the United States Supreme Court questioned, but did not rule upon, the propriety of applying the *Cuyler v. Sullivan* standard beyond an actual conflict of interest brought about by concurrent multiple representation of clients or by prior representation of clients so as to include situations in which counsel's personal or financial interests are implicated.

impose the life imprisonment sentence he would have received had he pled guilty — but appellant declined that remedy and asserted instead his entitlement to a new trial. However, the grant of a new trial is not an available option since the circumstances of the actual conflict established in this case are not of the magnitude that render the likelihood of an unreliable verdict so high that we abandon the case-by-case inquiry of the *Strickland* prejudice prong. Since appellant has not established an actual conflict of interest that would entitle him to a new trial and declined the remedy available to him, the trial court did not err in holding that appellant did not establish he received ineffective assistance of counsel.

(b) Appellant claims trial counsel performed deficiently when she did not have appellant testify at the *Jackson-Denno* hearing to rebut a detective's testimony that appellant did not ask for an attorney. At the hearing on the motion for new trial, appellant testified he told counsel at the pre-trial hearing that he had asked for an attorney during a break between videotaped sessions of his interview with detectives; at the motion-for-new-trial hearing, trial counsel testified she did not recall having such a conversation with her client and, had he so informed her, she would have called him to testify at the *Jackson-Denno* hearing to rebut the testimony of the detective. In light of the conflicting testimony, the trial court was authorized to conclude that trial counsel, whom the trial court had described during the hearing as "one of the best trial lawyers I have seen, . . . very effective[,] . . . a great cross-examiner, argues as well as anybody that I have seen, and . . . she works hard for her clients," was more credible than appellant.

(c) Appellant asserts trial counsel performed deficiently when she requested and received a charge on mutual combat because mutual combat requires both parties to be armed and there was no evidence appellant was armed. There is a conflict in the case law with regard to whether there must be evidence that mutual combatants have deadly weapons in order for the jury to be charged on the law of mutual combat. Compare *Jenkins v. State*, 270 Ga. 607 (2) (f) (512 SE2d 269) (1999); *Donaldson v. State*, 249 Ga. 186 (3) (289 SE2d 242) (1982); *Bangs v. State*, 198 Ga. App. 404 (1) (401 SE2d 599) (1991) (mutual combat generally involves deadly weapons); *Sinkfield v. State*, 266 Ga. 726 (2) (470 SE2d 649) (1996) (mutual combat charge is proper when there is evidence of a mutual intention or agreement to fight), with *Nelms v. State*, 285 Ga. 718 (4) (b) (681 SE2d 141) (2009); *Hudson v. State*, 280 Ga. 123 (2) (623 SE2d 497) (2005); *Demons v. State*, 277 Ga. 724 (3) (595 SE2d 76) (2004); *Moses v. State*, 270 Ga. 127 (6) (508 SE2d 661) (1998) (there must be evidence that the combatants are

armed with deadly weapons to authorize a charge on mutual combat).[7] However, we need not resolve that conflict in this case because the instruction given the jury made no mention about the use of deadly weapons and informed the jury that there need only be a mutual intent or mutual agreement to fight and combat between two persons as a result of a sudden quarrel or circumstances indicating a purpose, willingness, and intent on the part of both to engage mutually in a fight. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.10.43 (4th ed.).

(d) In light of our determination in Division 1 (c), supra, that the evidence was sufficient for a rational trier of fact to find appellant guilty beyond a reasonable doubt of concealing a death, trial counsel did not perform deficiently by failing to seek a directed verdict of acquittal on that charge.

(e) Appellant next cites three instances in the State's closing argument where, he contends, trial counsel performed deficiently in failing to voice an objection or seek a mistrial. We note the wide latitude afforded counsel in closing argument (*Smith v. State*, 284 Ga. 599 (2) (a) (669 SE2d 98) (2008)), that the failure to make a meritless objection cannot serve as evidence of ineffective assistance (*Moore v. State*, 278 Ga. 397 (2) (e) (603 SE2d 228) (2004)), and appellant must show that there is a reasonable probability that the outcome of his trial would have been different had counsel voiced an objection to any of the argument appellant has highlighted. *Sanford v. State*, 287 Ga. 351, 357 (5) (d) (695 SE2d 579) (2010).

In her closing argument, the prosecutor followed an extensive quotation of the pattern charge on reasonable doubt with hypothetical juror misgivings ("we are not really sure, but I feel like he's guilty, but I don't really know," "we've got to give him the benefit of the doubt"), and stated the purported misgivings did not constitute reasonable doubt. Further into her argument, the prosecutor told jurors that, "[a]s jurors, you have a responsibility to kind of set the pace and tone for us. What you say is law. And if you say . . . what Mr. White did was right, . . . then you let him go." Lastly, appellant contends counsel performed deficiently in failing to object to the prosecutor's suggestion in closing argument that appellant had an opportunity to retreat and did not take it, and thereby lost his entitlement to consideration of self-defense and accident as defenses. Taken in context, the argument appears to address appellant's testimony that the victim attacked him with a knife in the house;

---

[7] When the weapons involved are not deadly weapons *per se*, whether the weapons used by the combatants constitute deadly weapons is for the jury to determine. See, e.g., *Simmons v. State*, 172 Ga. App. 695 (1) (324 SE2d 546) (1984) (depending on the manner and means of the use of a motor vehicle, jury could decide it was a deadly weapon).

that he pushed her away from him, causing her to strike her head; and that he inadvertently caused the victim's death when he used a chokehold to drag the unconscious victim to the park. The prosecutor suggested that, under appellant's theory of the case, had appellant just walked away after causing the victim to strike her head, his defense to the murder of the victim would not be in play because the victim would not be dead.

In its subsequent instructions to the jury, the trial court extensively charged on the State's burden of proof and the presumption of innocence, the role of the jury, and justification as a defense. In light of the strength of the evidence against appellant and the trial court's instructions to the jury, we conclude it is unlikely that, to the extent the prosecutor's remarks might have been improper, that the failure of trial counsel to object to them changed the result of the trial. See *Shields v. State*, 272 Ga. 32 (2) (526 SE2d 845) (2000).

*Judgment affirmed and case remanded for resentencing. All the Justices concur.*

DECIDED JUNE 28, 2010 —
RECONSIDERATION DENIED JULY 26, 2010.

*Charles H. Frier*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Elizabeth A. Baker, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Reggie A. Lampkin, Assistant Attorney General,* for appellee.