297 Ga. 418
FINAL COPY

S15A0430. PENA v. THE STATE.

HUNSTEIN, Justice.

Flavio Garay Pena was convicted of malice murder and related crimes in connection with the death of Jose David Cruz Hernandez. Pena appeals the denial of his amended motion for new trial, contending that the evidence was insufficient for a jury to find him guilty; the trial court erred in refusing to strike a juror for cause, denying his motion to exclude his custodial statement, excluding certain testimony, and giving an improper jury charge; and his trial counsel rendered ineffective assistance. Finding no error, we affirm.[1]

---

[1] On January 23, 2008, a Gwinnett County grand jury indicted Pena for malice murder, felony murder, and aggravated assault. Pena was tried before a jury on October 15-19, 2012, and found guilty on all counts. On October 22, 2012, the trial court sentenced Pena to a term of life imprisonment on the malice murder count. The remaining counts merged or were vacated by operation of law. Through trial counsel, Pena filed a motion for new trial on October 26, 2012, which was amended through new appellate counsel on March 11, 20, and 28, 2014. The trial court denied Pena's amended motion for new trial on May 12, 2014. Pena filed a notice of appeal on May 15, 2014, which he amended on May 27, 2014. In accordance with the notice of appeal, the case was originally docketed in the Court of Appeals, but, through an order entered on October 21, 2014, the Court of Appeals properly transferred the case to this Court. The case was docketed to the January 2015 term of this Court and was submitted for decision on the briefs.

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. At approximately 3:30 a.m. on the morning of November 4, 2007, Gwinnett County police responded to a call about a fight in the Arnold Road area and encountered Pena and another man walking down the road. The officers observed that the bottoms of both legs on Pena's jeans were "completely encircled" with blood and that he had blood on the top of his work boots. Pena told the officers that he was "fighting a friend," the friend made him mad, and he "kicked his a**." When one of the officers asked Pena if he used any weapons on his friend, Pena responded that he did not need any weapons, and he started to laugh and pointed at his bloodied boots. During this time, Pena never indicated to the officers that he was frightened of this friend or that this friend had attacked him. Officers arrested Pena for disorderly conduct. Additionally, neither the officers who encountered Pena on the road nor the officer who booked him into the detention center noticed any injuries on him, and Pena did not indicate that he had been injured. Later that same day, officers discovered the deceased victim, subsequently identified as Jose David Cruz Hernandez, lying face down in a drainage ditch near Arnold Road. The victim's face appeared to have been pushed or driven into the ground, a large area of pooling blood surrounded his head and upper torso, and there was blood spatter on the grass and road near the victim's body.

The medical examiner testified that the victim suffered numerous injuries, including the following: several depressed skull fractures at the top and back of the head, hemorrhaging inside the skull, fractures in the bones of each cheek that caused the right side of the face to be "flattened," injuries to the forearms consistent with defensive wounds, a tear to the brain stem, and a partially torn right ear, separated from the head. The tread-like pattern of bruising on the victim's left cheek suggested to the medical examiner that the bruising could have been caused by footwear. The medical examiner also opined that a significant amount of trauma to the victim's head occurred while "the head [was] down and supported against a firm surface, such as the ground, and with multiple blows occurring . . . in that position." The medical examiner identified the cause of death as blunt force trauma to the head, and she testified that it would have required "a significant amount of force" to cause the extensive fracturing of the skull that the victim suffered. Additionally, testing showed that DNA from blood recovered from Pena's jeans and boots matched the victim's DNA.

During Pena's subsequent police interview, Pena explained that he and the victim were walking down a roadway after leaving a club where they had been drinking. The victim began to "insult" Pena and then threatened him by repeatedly telling Pena that he was going to kill him. Pena believed that the victim was holding a broken bottle behind his back and was "scared" that the victim was going to kill him. Pena struck the victim with his hand, and the

3

victim fell to the ground. Pena encouraged the victim to get up, but each time the victim attempted to rise, Pena kicked him. Although Pena initially stated that he did so to prevent the victim from hitting him, he later stated that he did not think that the victim would have been able to get up and that he continued to kick the victim "[b]ecause he made [Pena] mad." Pena stated that he did not know whether the victim was alive or dead when he left him, and Pena "chuckled" as he indicated that he kicked the victim approximately 30 times. Finally, Pena noted that he and the victim had had prior difficulties.

1. The evidence as described above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Appellant was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). The issues of witness credibility and whether a killing is justified or intentional and malicious are for the jury, "and the jury is free to reject a defendant's claim that he acted in self-defense." White v. State, 287 Ga. 713, 715 (1) (b) (699 SE2d 291) (2010) (citation omitted). Pena contends that the State failed to prove beyond a reasonable doubt that he "was not acting as a reasonable person with battered person syndrome would [act] in the . . . presence of a real threat when [the victim] told [Pena that] he would kill him." See Chester v. State, 267 Ga. 9 (2) (471 SE2d 836) (1996) (explaining that battered person syndrome evidence is admissible and relevant in a proper case

4

as a component of justifiable homicide by self-defense). However, for the reasons discussed in Division 5, infra, the trial court properly did not allow the introduction of any evidence that Pena suffered from battered person syndrome.

2. Pena argues that the trial court abused its discretion in refusing to strike Juror 25 for cause because the prospective juror was biased. During voir dire, Juror 25 stated that he would "find it difficult to be somewhat impartial due to the fact that [Pena] beat somebody to death . . . versus it being impulsive, shooting somebody," and that he found it difficult to believe that a person could beat another person to death for ten to fifteen minutes. However, upon further questioning, Juror 25 indicated that he had not formed an opinion as to the guilt or innocence of the defendant, was prepared to listen to the facts, would not ignore the trial court's instructions, could listen to the evidence in the case and reach a decision based on that evidence, and believed that he could be fair and impartial. Based on these statements, the trial court refused to strike Juror 25 for cause. As this juror did not "express[ ] a position that was so fixed and definite that [he] would not be able to decide the case based on the evidence and the trial court's instructions," we do not find any manifest abuse of discretion in the trial court's refusal to strike this juror for cause. See Grimes v. State, 296 Ga. 337, 343-344 (1) (c) (766 SE2d 72) (2014). See Cade v. State, 289 Ga. 805 (3) (716 SE2d 196) (2011).

3. Pena contends that the trial court erred in denying a motion to exclude his custodial statement. Specifically, he alleges that the Spanish[2] version of the Miranda[3] warnings he was given did not adequately inform him of his constitutional rights. In support of his claim, he points to testimony in the record that the detective used "made-up" Spanish words and made mistakes in gender, accent, pronunciation, formality, and conjugation when giving the Miranda warnings to Pena.

"The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances." Sosniak v. State, 287 Ga. 279, 279 (1) (695 SE2d 604) (2010) (citations and punctuation omitted). Furthermore, we have explained:

> When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts. . . . [T]his Court has identified three corollaries of th[is] principle, which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts. First, an appellate court generally must accept those findings unless they are clearly erroneous. Second, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. And third, an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court.

---

[2] Pena's native language was Spanish, although he also spoke limited English.

[3] Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

6

Hughes v. State, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) (citations and footnotes omitted).

The testimony at the Jackson-Denno[4] hearing showed the following. A Spanish-speaking detective gave Pena his Miranda warnings and assisted in communications between Pena and another detective during Pena's interview. A certified court interpreter, who had reviewed a videotape of the interview, testified that the Spanish-speaking detective told Pena the following in Spanish at the beginning of the interview: "before we talk, I have to tell you about your rights"; "you have to understand your rights"; "you can stay silent"; "[a]nything you say would be used against you in court"; "[y]ou can have an attorney before or after"; "[i]f you don't have enough money to pay for an attorney, then you can ask for one to be appointed to you"; "this person could be present during any interrogation"; "do you wish to answer any questions without an attorney being present?"; and "you can stop the interrogation at any time." The interpreter testified that the detective "mispronounced" the Spanish word for "interrogation" and used "a made up word" that sounded similar to the Spanish word for "name" in explaining to the defendant that he could have an attorney "named" for him. However, she also testified that she was able to interpret the detective's

---

[4] Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

7

statements by putting the words in context, which she indicated was not unusual when interpreting. Finally, the interpreter testified that the officer asked Pena, "Do you understand the rights? Are you sure?" followed by "Do you want to talk to us now?" and that Pena responded by stating, "Uh-huh," to indicate that he understood his rights and again to indicate that he was willing to talk with the detectives. According to the videotape of the interview, Pena also nodded his head in the affirmative. The interpreter also testified that she had reviewed the videotaped interview in its entirety and that at no point were any threats or promises communicated in Spanish to Pena nor did Pena make a request to stop the interview or for an attorney.

After hearing this evidence and viewing the videotaped interview, the trial court found that, even though the detective used "some unintelligible words," "the totality of the circumstances show[ed] that the defendant . . . was aware that he was being informed of his critical <u>Miranda</u> rights at the time, . . . that [he] made a knowing and intelligent waiver of his <u>Miranda</u> rights and that the statement made after the waiver of those rights w[as] . . . voluntarily given." Considering the totality of the circumstances, the trial court was authorized to conclude that the State had shown by a preponderance of the evidence that Pena knowingly and voluntarily waived his <u>Miranda</u> rights and that his statement was voluntary. See <u>Delacruz v. State</u>, 280 Ga. 392 (2) (627 SE2d 579) (2006) (holding that whether an accused understood the <u>Miranda</u> warnings depends on

the totality of the circumstances, not solely on the interpreter's skill, and that an imperfect translation of the rights does not rule out a valid waiver as long as the accused understood the warnings).

4. Pena argues that the trial court erred in disallowing the testimony of Pena's sister, that Pena had told her that the victim had inflicted the injuries on him. The trial court did not abuse its discretion in correctly concluding that, unless Pena testified and was subject to cross-examination, his sister's proffered testimony was inadmissible hearsay because she was not able to testify from her own direct knowledge that the victim inflicted the injuries on Pena. See Parker v. State, 276 Ga. 598 (2) (581 SE2d 7) (2003) (holding that a defendant's self-serving pre-trial statements are inadmissible hearsay unless the defendant testifies); Grano v. State, 265 Ga. 346 (3) (455 SE2d 582) (1995) (holding that evidence of a victim's prior violent acts may not be established by hearsay testimony); see also Smith v. State, 284 Ga. 304 (3) (667 SE2d 65) (2008) (holding that a trial court's evidentiary rulings are reviewed for an abuse of discretion). Furthermore, the trial court did not abuse its discretion in disallowing Pena's sister to testify that she had seen bruises or injuries on Pena when he was living with the victim. As the trial court concluded, the testimony was not relevant without evidence showing that the victim caused the injuries, and Pena made no proffer that included such evidence. See State v. Hodges, 291 Ga. 413, 417 (728 SE2d 582) (2012) (emphasizing that "a linchpin of the 'chain

9

of reason'" in admitting a victim's prior acts of violence as relevant to a defendant's justification defense is that the "defendant prove that the victim committed the prior acts of violence").

5. Pena contends that the trial court erred in disallowing expert testimony regarding his symptoms of post-traumatic stress disorder and his relatives' testimony about physical abuse and corporal punishment that he experienced in childhood. He asserts that the exclusion of this evidence prevented him from presenting a justification defense based on battered person syndrome. However, the evidence in question was not admissible to support Pena's justification defense. "Because justification is based on the fears of a reasonable person, the subjective fears of a particular defendant are irrelevant in the evaluation of this defense." O'Connell v. State, 294 Ga. 379, 382 (3) (754 SE2d 29) (2014) (citation omitted; emphasis in original). Therefore, evidence of abuse or violent acts committed against a defendant by someone other than the victim is not admissible to support a justification defense. See id. (finding evidence of childhood abuse committed against the defendant by someone other than the victim inadmissible to support a justification defense); Bryant v. State, 271 Ga. 99 (3) (515 SE2d 836) (1999) (same as to expert testimony that the defendant suffered from a post-traumatic stress disorder from childhood abuse committed by someone other than the victim). Moreover, Pena was unable to proffer any admissible evidence indicating that he and the victim had a close personal

relationship or that the victim had a history of abusing him. See Mobley v. State, 269 Ga. 738, 740 (1) (505 SE2d 722) (1998) (listing applicable factors in determining whether a self-defense claim based on the battered person syndrome has been established). Accordingly, we find no abuse of discretion on the part of the trial court, and thus, no error.

6. (a) Pena argues that the court erred in giving the following jury charge:

> In applying the laws of self-defense, a person is justified to kill another person in defense of self or others. The standard is whether the circumstances were such that they would excite the fears of a reasonable person. For the killing to be justified under the law, the accused must truly have acted under the influence of these fears and not in the spirit of revenge.

Pena contends that it was plain error within the meaning of OCGA § 17-8-58 (b) to charge the jury that, in order for a killing to be justified, the defendant must not have acted "in the spirit of revenge."

Pena has waived plain error analysis of this issue because he requested the charge in question and made no objection to the charge at trial. White v. State, 297 Ga. 218 (__ SE2d __) (2015) (holding that the defendant waived plain error analysis where "he requested the pattern charge in question and agreed with the trial court's ultimate decision to give the charge"). Moreover, a review of the trial transcript shows that defense counsel tailored his closing argument to this charge and twice told the jury that the State had the burden of disproving

11

beyond a reasonable doubt that Pena had acted under the influence of a reasonable fear and not in a spirit of revenge. Under these circumstances, Pena affirmatively waived for appellate review the error that he now alleges, and thus, it provides no basis for reversal.

(b) Nevertheless, because Pena also claims that his trial counsel provided ineffective assistance with respect to this jury charge, see Division 7, infra, we will address the merits of this charge. See Woodard v. State, 296 Ga. 803 (3) (b), (771 SE2d 362) (2015); Hartsfield v. State, 294 Ga. 883 (2) (757 SE2d 90) (2014). Pena alleges that this jury instruction placed an additional burden on him not authorized by the statutory definition of justification in OCGA § 16-3-21 because the language, "the spirit of revenge," no longer appears in this statute.[5]

---

[5] The language in section 26-1012 of the Code of 1933 provided that a defendant is justified in using deadly force only if "the party killing really acted under the influence of th[e] fears [of a reasonable man], and not the spirit of revenge." In 1968, when the statutes setting forth defenses to criminal liability were rewritten as a part of an act to provide a new Georgia Criminal Code, the "spirit of revenge" language was omitted from the provisions defining justification. See Ga. L. 1968, pp. 1249, 1272-1274, enacting Chapter 26-9, "Defenses to Criminal Liability," composed of Code Ann. §§ 26-901 through 26-907; Code Ann. § 26-902. The current version of the statute also omits this language. OCGA § 16-3-21.

"[A] jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law." Roper v. State, 281 Ga. 878, 880 (2) (644 SE2d 120) (2007) (citation and punctuation omitted). It is well settled that "[t]he law will not justify a killing for deliberate revenge however grievous the past wrong may have been." Pearson v. State, 277 Ga. 813, 814 (1) (596 SE2d 582) (2004) (citation and punctuation omitted) (explaining that a defendant who kills another out of revenge is guilty of the crime of murder). See, e.g., Slaughter v. State, 278 Ga. 896, 897 (608 SE2d 227) (2005). Additionally, when comparing the current language of OCGA § 16-3-21 with the previous statute that included the "spirit of revenge" language, we have remarked that "[i]n essence the old law and the new law have the same standard as to justification of homicide." Brooks v. State, 227 Ga. 339, 342 (3) (180 SE2d 721) (1971). Therefore, the instruction at issue is a correct statement of the law. See Teems v. State, 256 Ga. 675 (4) (352 SE2d 779) (1987) (holding that the court's charge, that "the law will not justify a killing for deliberate revenge however grievous the past wrong may have been," was a correct statement of law).

Having reviewed the trial court's jury charges as a whole, see Davis v. State, 290 Ga. 757 (5) (725 SE2d 280) (2012), we conclude that the charges properly covered the applicable principles of law and did not add an additional "hurdle" to Pena's affirmative defense of justification, as he contends.    7.  Pena argues that trial counsel was ineffective for requesting the jury charge discussed

in Division 6, supra, because it included the outdated and prejudicial language regarding the "spirit of revenge." To prevail on this claim, Pena must show that trial counsel performed deficiently and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See Strickland v. Washington, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984); Wesley v. State, 286 Ga. 355 (3) (689 SE2d 280) (2010).

As explained in Division 6 (b), supra, this instruction was not legally improper. Accordingly, Pena's ineffective assistance claim fails. See Vergara v. State, 287 Ga. 194, 198 (3) (b) (695 SE2d 215) (2010).

Judgment affirmed. All the Justices concur.


Decided June 29, 2015.

Murder. Gwinnett Superior Court. Before Judge Walker, pro hac vice.

Sharon L. Hopkins, for appellant.

Daniel J. Porter, District Attorney, Tracie H. Cason, Christopher M. Quinn, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.