In the Supreme Court of Georgia

Decided: November 2, 2015

S15P0675. MARTIN v. THE STATE.

HINES, Presiding Justice.

A jury convicted DeKelvin Martin of raping his girlfriend, Tymika Wright, murdering her 12-year-old child, Savion Wright, and her elderly grandparents, Travis Ivery and Ila Ivery, by stabbing each of them repeatedly, committing aggravated sodomy against Ms. Wright in the presence of the 2-year-old child that Martin and Ms. Wright had together, Christin Martin, and related crimes.[1] The jury found multiple statutory aggravating circumstances

_____

[1] Martin committed his crimes on October 1, 2002. He was originally indicted on December 6, 2002, by a Fulton County grand jury for the murders of Savion Wright and Travis Ivery, along with related crimes. On January 13, 2003, the State filed written notice of its intent to seek the death penalty. On September 5, 2003, after Ila Ivery died, Martin was reindicted on the following counts: three counts of malice murder, three counts of felony murder, four counts of aggravated assault with a deadly weapon, one count of armed robbery, two counts of aggravated sodomy, one count of rape, and two counts of cruelty to children in the second degree. In 2004, after initially granting review, this Court dismissed for lack of jurisdiction an interim review claim by the State in which it sought the recusal of the original trial judge. See *State v. Martin*, 278 Ga. 418 (603 SE2d 249) (2004). Martin then pled guilty in 2005 and received a death sentence in a bench trial. On January 11, 2005, Martin filed a motion for a new trial, and he amended that motion on March 30, 2005. After the recusal of the original trial judge and the remaining judges of the circuit, a judge from the Douglas Judicial Circuit granted the State's motion to disqualify Martin's original trial counsel and then later granted Martin's motion to withdraw his guilty plea based on the incomplete recitation at the plea hearing of the rights that Martin would have at his bench trial. This Court dismissed the State's

related to the murders of Savion Wright and Travis Ivery and recommended a death sentence for those murders, which the trial court imposed along with a life sentence for the murder of Ila Ivery and other related sentences. For the reasons set forth below, we affirm.

1. (a) Viewed in the light most favorable to the State, the evidence presented at trial, drawn largely from Tymika Wright's testimony, showed the following set of facts. Martin had been dating his girlfriend, Tymika Wright,

appeal of the order allowing the withdrawal of Martin's guilty plea, citing this Court's lack of jurisdiction. See *State v. Martin*, S07A0871 (decided on Mar. 26, 2007). See also *Boykin v. Alabama*, 395 U. S. 238 (89 SCt 1709, 23 LE2d 274) (1969). On September 26, 2007, the State filed a second written notice of its intent to seek the death penalty. In October of 2008, this Court addressed on interim review the admissibility of the prior testimony of Tymika Wright, who had died since the first trial. See *Martin v. State*, 284 Ga. 504 (668 SE2d 685) (2008). In a trial held on December 16-17, 2008, a jury found that Martin was mentally competent to stand trial. Martin's retrial, this time before a jury, was held from January 5 to February 11, 2009. On the State's motion, the trial court entered an order of nolle prosequi regarding one of the two aggravated sodomy counts. On February 6, 2009, the jury acquitted Martin of the armed robbery count but found him guilty of the lesser included offense of theft by taking, acquitted Martin of one of the cruelty to children counts, and convicted Martin of the remaining counts. On February 11, 2009, the jury recommended a death sentence for the murders of Savion Wright and Travis Ivery. That same day, the trial court, in light of the malice murder convictions, properly imposed no sentences on the felony murder counts, see *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993), and aggravated assault counts involving the murder victims, see *Hulett v. State*, 296 Ga. 49, 55 (2) (a) (766 SE2d 1) (2014), imposed death sentences for the murders of Savion Wright and Travis Ivery, and imposed consecutive sentences of life imprisonment for the murder of Ila Ivery, 20 years' imprisonment for the aggravated assault of Tymika Wright, 20 years' imprisonment for the remaining aggravated sodomy count, life imprisonment for the rape, 12 months' imprisonment for the theft by taking, and 12 months's imprisonment for the cruelty to children in the second degree. Martin filed a motion for a new trial on February 23, 2009, which he amended on March 1, 2012, December 11, 2012, and February 22, 2013. The trial court denied the motion in an order filed on March 19, 2013, set that order aside, and filed a reissued order on May 16, 2013. Martin filed a timely notice of appeal on May 17, 2013. This appeal was docketed to the April 2015 term of this Court, and the case was orally argued on July 14, 2015.

2

for approximately five years, and they were living with Ms. Wright's elderly grandparents, Travis and Ila Ivery, along with Ms. Wright's 12-year-old son from a prior marriage, Savion Wright, and the 2-year-old son she had with Martin, Christin Wright.[2]  On the night and early morning of September 30 to October 1, 2002, Martin consumed a large quantity of alcohol, some powder cocaine, and then some crack cocaine.

At about 1:30 a.m., Martin tapped on Ms. Wright's window, and she let him in through the kitchen door.  Martin told Ms. Wright that he wanted to speak to her about something, he went into the den and sat on the couch, and she sat in front of him in a chair.  He told her that he wanted to move back to his hometown, Fitzgerald, Georgia.  He then asked her if she wanted to have sex.  She said, "no," but offered to make him something to eat.  He said that he was not hungry, but he went with her to the kitchen to look at the food that she had left from the family dinner that he had missed earlier.  As she was preparing the food, he took a knife from the dishwasher, grabbed her, told her that he would

---

[2] The original indictment and the transcript from the bench trial held in 2005 spell this name as "Christin," while the second indictment and the transcript from the trial held in 2009 spell it as "Christian."  Because the parties both have spelled the name in this appeal as "Christin," we adopt that spelling for this opinion.

kill everyone in the house if she said anything, dragged her into the den, and pushed her onto the couch. She reminded him that he previously had vowed not to act like that and reassured him that her grandparents were not angry that he had been out late. He apologized and placed the knife on the side of the couch, and she talked him into turning on the television and then hid the knife under a pillow in her bedroom. Savion got up from bed and came into the hallway, and Martin stood in the doorway from the den to the hallway and greeted him. Ms. Wright sent Savion back to bed and turned around to find Martin making a face, standing close to her, and "acting paranoid and nervous." She asked him if he was on drugs, but he denied that he was. She decided to try to calm him by making conversation and by again reassuring him that no one had a problem with his having come home at 1:30 a.m.

Ms. Wright failed to calm Martin, he again asked her for sex, and she agreed in the hope that he would go to sleep afterward. She asked him if she could turn a light on, but he said that she would "regret it" if she did. They were "on the floor" and "started to have sex," but a light came on in the hallway in the back of the house. Ms. Wright got up, she found Ms. Ivery in the hallway, she helped Ms. Ivery to the bathroom, and then Ms. Ivery went back to bed. Martin

4

and Ms. Wright then "started again" having sex, but the hallway was illuminated when Savion left his bedroom at the back of the house and turned on the light in the bathroom near his room.  After Savion went back to bed, Martin and Ms. Wright again "started to have sex, but [he] couldn't keep an erection."  He accused her of cheating on him or having something wrong with her, but she denied the accusations.  He then called her names and told her that she "smelled like [she had] been with somebody else."  She laughed and explained that she had been at the house all day.

Martin and Ms. Wright were at this point still on the floor in the den.  He told her to turn around, she turned around and got on her knees to stand, and he grabbed her around the neck and began choking her.  She broke away from him, told him that he would have to leave the house, began walking down the hallway toward her bedroom to retrieve her car keys, and called for Savion.  Martin came toward her fast in the hallway, she tried to hold a door shut to keep him away from her, she screamed for Savion to get up and call the police, her grip on the door began slipping, she screamed for Mr. and Ms. Ivery to help her, and Martin snatched the door from her grip.  Martin walked slowly past Ms. Wright, grabbed Savion near the door to his bedroom, and started stabbing Savion in the

neck as Savion tried to break free.[3]  Ms. Wright got between Martin and Savion, and Martin stabbed her in the back and cut her face as he tried to pursue Savion. Ms. Wright continued to scream for Mr. and Ms. Ivery.

Martin pursued Savion, who had fled to the bathroom.  Ms. Ivery, bracing herself because she was barely able to stand given her medical condition, tried to block Martin in the bathroom doorway as he reached past her trying to stab Savion, stabbing Ms. Ivery in the process.  Ms. Ivery called for Mr. Ivery, prompting Martin to stab her more.  Ms. Wright told Savion to run, but he collapsed to the floor after three or four steps and then made a gurgling sound. As Ms. Wright and Ms. Ivery struggled with Martin, Mr. Ivery came out of his room, he grabbed Martin, and Martin began stabbing him.  Martin then pushed Mr. Ivery backwards onto his bed, straddled over the top of him, and stabbed him repeatedly in the chest.  Ms. Wright reached for the telephone, but Martin cut the telephone cord.  Ms. Wright ran for another telephone, but she stopped when she saw Martin standing over Christin and Savion with a knife.  After

---

[3] At least three knives were involved in the crimes.  After the crimes, one was found under Ms. Wright's pillow, where she said she hid it after the initial attack on her, one was found buried in a flower pot outside, where Martin admitted that he had secreted it as he left the house, and one was found broken in half, with the blade left inside Mr. Ivery's chest and the handle left on the floor.

Christin laid his head over Savion, Martin began running back and forth between Mr. and Ms. Ivery and stabbing them. Ms. Ivery begged Martin to stop stabbing her and just let her die, but he continued to stab her.

Martin took Ms. Wright by the hand and took her into another room, while Christin held her leg and she begged for her life. Martin told her that she had to perform oral sex on him if she wanted to live and pushed her to her knees as he held a knife to her head and as Christin continued to hold onto her leg. After she submitted to oral sex with him, he demanded vaginal sex. At that point, she was "trying to do anything that he's saying," but he did not respond when she offered him some food as a distraction. However, Martin agreed to leave the house when Ms. Wright offered to give him money from Mr. Ivery's wallet. At this point, Ms. Wright was still unclothed. After first trying to clean blood off of Ms. Wright's face in a bathroom sink, Martin and Ms. Wright got into the shower together to clean her. Martin disassembled a cellular telephone when he discovered that Ms. Ivery was attempting to use it.

Martin then ordered Ms. Wright into her vehicle, although Ms. Wright insisted that Christin stay behind. Ms. Wright failed to get the attention of a police officer when the vehicle was stopped at a routine police roadblock.

7

Martin later allowed Ms. Wright to call 911 on a payphone, because Christin had been left in the house unattended. Martin directed her to drive in various directions, directed her to begin driving to a recreation center, told her that he was going to let her go, told her to stop at a gas station on the way, and then walked away from the vehicle with her still seated inside.

In response to Ms. Wright's earlier 911 call and a 911 call from Ms. Ivery, police officers and paramedics discovered Christin crawling around near Savion's lifeless body. Mr. Ivery was gasping for air and died as he was being transported to the hospital. Ms. Ivery was having trouble breathing, was transported to the hospital, remained in the hospital for three months, and died a month after her release as a result of complications from her stab wounds.

(b) Among the crimes of which he was convicted, Mr. Martin challenges the sufficiency of the evidence only as to his rape conviction.[4] We explain below why we conclude that the evidence of Martin's commission of a rape was sufficient.

---

[4] Martin raises the challenge only as part of a claim that the jury was improperly permitted to consider and find the statutory aggravating circumstance concerning a murder committed during the commission of a rape. See Division 13 below. However, we address the matter here as part of our routine review of the sufficiency of the evidence to support guilty verdicts and then refer to this analysis several times below.

The evidence of rape suggests the possibility that a rape occurred on *two* separate occasions, one before Martin stabbed Ms. Wright and the other victims and one afterward. Martin focuses his argument on the evidence of the second possible rape. As stated above, this second possible rape was preceded by Martin's forcing oral sex on Ms. Wright, whereupon he demanded vaginal sex. Ms. Wright described this second instance of possible rape as follows:

> [H]e said that he wanted to have sex and . . . he still has the knife, and I'm like trying to do anything that he's saying – asking me to do because at that point I didn't want to die. But at the same time I'm thinking, oh, my God, I've got to get out of this house. What am I going to do to get out of this house? So I start offering him stuff. I was like, do you want to eat – what is it that – you know, I'll go with you wherever it is, you know, to get you to leave this house, but you've got to go. And he didn't seem to respond to anything that I said, and I said, I have money. Would you take money? I have money. And that seemed to, you know – he was like, okay.

Her testimony also shows that she was unclothed at the conclusion of this second incident. The State argues that this testimony standing alone permits a conclusion that the evidence was sufficient to authorize the jury to conclude beyond a reasonable doubt that Martin raped Ms. Wright. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979) (providing the constitutional standard for the review of the sufficiency of the evidence of a

crime). However, we need not reach a conclusion on the sufficiency of the evidence of a rape based on this testimony, because there is much clearer evidence of rape regarding the *earlier* incident that occurred shortly after Martin arrived at the house.[5]

As set forth above, shortly after arriving at the house and before stabbing anyone, Martin asked Ms. Wright if she wanted to have sex with him, and she said, "no." Martin then took a knife from the dishwasher, grabbed Ms. Wright, told her that he would kill everyone in the house if she said anything, dragged her into the den, and pushed her onto the couch. At this point, the evidence of coercion is undeniable. We do note that, after Ms. Wright reminded Martin that he had previously promised not to terrorize her in such a manner, he put down the knife, and she distracted him with the television and hid the knife. However, Ms. Wright's hiding of the knife demonstrates that she remained afraid of him and what he might do to her, and she knew that Martin could easily obtain another knife from the kitchen nearby. Ms. Wright's testimony also shows that,

---

[5] Although not necessary to our holding here, we note that the jury apparently found that the rape occurred before the stabbings. The jury found in its verdict that a rape had occurred at *some* point, and it is clear that it either occurred before the stabbings while Christin was still asleep or after the stabbings while Christin clung to Ms. Wright's leg. While the jury convicted Martin of cruelty to children in the second degree for forcing Ms. Wright to perform oral sex in Christin's presence, it acquitted Martin of committing a rape in Christin's presence.

when Savion got up from bed and greeted Martin at the doorway to the den, Martin made some sort of facial expression that struck her as noteworthy, stood uncomfortably close to her, and acted "paranoid and nervous." At this point, she felt it necessary to make conversation to distract him and to reassure him that no one in the family was angry with him in an effort to calm him. However, her testimony shows that he did *not* calm down, and he again asked her for sex. As she was preparing to comply, she made the minor request that she be permitted to turn on a light. His reply that she would "regret it" if she did confirmed for Ms. Wright that she truly was in great danger. In light of this testimony, we easily conclude that whatever sexual contact that actually occurred at that time was coerced and thus was committed "forcibly and against [Ms. Wright's] will." OCGA § 16-6-1 (a) (1). See *Curtis v. State*, 236 Ga. 362, 362 (1) (223 SE2d 721) (1976) ("True consent to the act, of course, negates the element of force; but it is both entirely logical and legally certain that apparent 'consent' induced by fear is not the free consent required to prevent the act's constituting a crime, but is the mere product of force within the meaning of the statute.").

11

Rape also includes the element of "carnal knowledge." OCGA § 16-6-1 (a). "Carnal knowledge of rape occurs when there is *any* penetration of the female sex organ by the male sex organ." Id. (emphasis supplied). See *Loyd v. State*, 288 Ga. 481, 491 (4) (c) (705 SE2d 616) (2011) (noting that "an entering of the anterior of the organ, known as the vulva or labia, is sufficient" (punctuation and citation omitted)). From her testimony, we know that Ms. Wright and Martin were on the floor in the den when they "started to have sex." Under ordinary circumstances, the phrase, "started to have sex," can imply foreplay in anticipation of penetration. However, under the extreme circumstances described by Ms. Wright, who was speaking from her own perspective as a victim, the jury was authorized to view the phrase differently. Furthermore, the jury was authorized to infer that penetration occurred from Ms. Wright's testimony that, during the third time that Martin "started to have sex" with her, he was unable to "*keep* an erection" (emphasis supplied), because that phrase suggests that he had an erection at first in that third incident as well as suggests that his difficulty in the third incident contrasted with his performance in the two earlier incidents. We conclude that the evidence of penetration was sufficient. See *Payne v. State*, 231 Ga. 755, 755 (1) (204 SE2d 128) (1974) ("In

12

a rape case, penetration may be proved by indirect or circumstantial evidence."). See also *Jackson*, 443 U. S. at 319 (III) (B) (holding that a proper review of the sufficiency of the evidence under the due process clause "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

Finally, we address Martin's argument that, despite the evidence of rape described above, the jury was unauthorized to find that a rape had occurred because Ms. Wright did not report the rape early in her interactions with investigators. We find this argument unpersuasive for four reasons. First, a rape conviction is not unauthorized under the law simply because the victim chooses not to report the rape immediately. See *Watson v. State*, 235 Ga. 461, 463 (2) (219 SE2d 763) (1975) (holding that a delay in reporting an alleged rape goes to the victim's credibility, which is solely a jury question). Second, the jury might well have considered Ms. Wright's early failure to report the rape as unremarkable in light of the staggering nature of the crimes against her closest family members that she *did* manage to report in those early interactions with investigators. Third, Ms. Wright failed to report *any* sexual assault in her early

13

interactions with investigators, including the aggravated sodomy that Martin does not even contest. Fourth and finally, the jury was authorized to disregard Ms. Wright's delay in reporting the rape in its deliberations in light of her obvious credibility and her lack of a motive to add an accusation of rape in a case that already involved three brutal murders.

(c) Upon our review of the record, including the review of the evidence of rape discussed in detail above, we conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Martin was guilty of all of the charges of which he was convicted. See *Jackson*, 443 U. S. 307. See also U.A.P. IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

*Pretrial Issues*

2. Martin argues that the judge presiding over his first motion for a new trial, which included an alternative motion to withdraw his guilty plea, erred by removing the defense attorneys who had represented him leading up to and during his first trial. We find that, under the unusual circumstances of this case,

the presiding judge did not abuse his discretion by removing Martin's original counsel.

(a) From the beginning of his case, Martin was represented by Thomas West and Robert Citronberg. These original lawyers represented Martin on interim review in 2004, when the State attempted to appeal the original trial judge's decision not to recuse herself after the State alleged that she had made a promise to Martin from the bench in a pretrial hearing that she would impose a sentence of life without parole if Martin would plead guilty and agree to a bench trial. Martin's original lawyers insisted that no such promise had been made and that the trial judge instead had made clear that she would consider all three sentences. This matter was never considered by this Court, however, because there was no statutory authority at the time for this Court to exercise jurisdiction over the State's appeal. See *State v. Martin*, 278 Ga. 418 (603 SE2d 249) (2004). But see also OCGA § 5-7-1 (9) (as amended in 2005 and subsequently).

Following this dismissed interim review, Martin's original lawyers continued to represent Martin, and Martin entered a guilty plea in 2005 and agreed to waive his right to a jury trial on sentencing and to be sentenced in a

15

bench trial conducted by his original trial judge in the Superior Court of Fulton County. At the conclusion of the bench trial, the original trial judge imposed a death sentence. Martin's original trial lawyers filed a motion for a new trial which, as amended, also sought to withdraw his guilty plea. The amended motion alleged that the original trial judge had promised Martin's original trial lawyers in an untranscribed conference in the judge's chambers that she would impose a sentence of life without parole if Martin would plead guilty and agree to a bench trial on sentencing. The State moved for the original trial judge's recusal, the original trial judge referred the motion to recuse for assignment to another judge in the same circuit, and the original trial judge was ordered recused. Martin's original lawyers then filed a motion to recuse *all* of the judges of the Atlanta Judicial Circuit, which was granted by the Chief Judge of the circuit.

Martin's case was then assigned to a judge from the Douglas Judicial Circuit, in order for him to preside over Martin's motion for a new trial and motion to withdraw the guilty plea. Martin's original lawyers issued subpoenas to the original trial judge and her staff, and the original trial judge moved to quash the subpoenas. The State then moved the presiding judge to order the

16

disqualification of Martin's original trial lawyers, arguing that they would be necessary witnesses at the hearing to be held on Martin's motion for a new trial. Martin's original lawyers filed briefs opposing the State's motion and included an affidavit from Martin expressing his desire to retain his original lawyers. After conducting a hearing, the presiding judge ordered the disqualification of Martin's original trial lawyers[6] and then appointed two new lawyers. The same presiding judge later, with Martin represented by the new lawyers, granted Martin's motion to withdraw his guilty plea based on the incomplete recitation at the plea hearing of the rights that Martin would have at trial, thus rendering moot the issue of the alleged promise from the original trial judge. Nevertheless, Martin's new lawyers never requested that the original lawyers be allowed to return to the case,[7] and Martin was represented at trial by one of the new lawyers appointed by the presiding judge and another new lawyer who was appointed later.[8]

---

[6] Martin's original lawyers obtained a certificate of immediate review from the presiding judge regarding the order to disqualify them, but they never filed an application for interlocutory appeal in this Court.

[7] Martin's new lawyers also never raised this matter in the interim review that occurred prior to Martin's new trial. See *Martin*, 284 Ga. 504.

[8] The possibility that Martin's original counsel could be disqualified *solely* for the purpose of the litigation of Martin's motion to withdraw his guilty plea based on the alleged promise was also

17

(b)  This Court has held as follows:

> An indigent defendant has no right to compel the trial court to appoint an attorney of his own choosing.  The choice of appointed counsel is a matter governed by the trial court's sound exercise of discretion and will not be disturbed on appeal unless abused.  However, when a defendant's choice of counsel is supported by objective considerations favoring the appointment of the preferred counsel, and there are no countervailing considerations of comparable weight, it is an abuse of discretion to deny the defendant's request to appoint the counsel of his preference.

*Davis v. State*, 261 Ga. 221, 222 (403 SE2d 800) (1991) (citations omitted).

One of the objective considerations favoring the appointment of a defendant's counsel of choice is counsel's "long-standing relationship with the defendant, who they contend is in a fragile state of mental health."  Id. (addressing a defendant's desire to retain counsel who had represented him in his previous trial in the same matter).  See also *Amadeo v. State*, 259 Ga. 469 (384 SE2d 181) (1989) (same).  Here, it is clear that Martin wished to have his original trial counsel continue representing him, and Martin's long previous relationship with

---

never raised by either his original counsel before their disqualification or by his new counsel. Instead, the parties presented the matter of the possible disqualification of Martin's original counsel to the presiding judge as an all-or-nothing proposition.  In that vein, we note that there is an important difference between a situation where a lawyer is prohibited from serving as a witness and an advocate and a situation where a lawyer has some complete disqualification from a case, such as that caused by a conflict of interest.  See *McLaughlin v. Payne*, 295 Ga. 609, 611 (761 SE2d 289) (2014).

18

them, which included their investigating and litigating the issue of his alleged mental illness, was clearly an objective consideration favoring their continued representation.

However, in considering the State's motion to disqualify Martin's original counsel, the presiding judge was also required to consider whether there were any "countervailing considerations of comparable weight." *Davis*, 261 Ga. at 222. This Court has recognized that a trial court has "'an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Davenport v. State*, 283 Ga. 29, 32 (2) (b) (656 SE2d 514) (2008) (quoting *United States v. Gonzalez-Lopez*, 548 U. S. 140, 152 (IV) (126 SCt 2557, 165 LE2d 409) (2006) (citations and punctuation omitted)). The presiding judge correctly identified the relevant ethical standard at issue here:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
> > (1) the testimony relates to an uncontested issue;
> > (2) the testimony relates to the nature and value of legal services rendered in the case; or
> > (3) disqualification of the lawyer would work substantial hardship on the client.

Georgia Rules of Professional Conduct, Rule 3.7.

19

We begin by applying the actual words of the ethical rule to Martin's case. First, we consider whether the presiding judge erred by viewing Martin's original lawyers as necessary witnesses. There was no dispute that the lawyers were the only witnesses, other than the original trial judge whose integrity was already being disputed by the lawyers, who claimed to have any knowledge about what the judge might have said to the lawyers in chambers.[9] Thus, as the parties agreed, the lawyers were necessary witnesses if the claim regarding the judge's statements were to go forward. See *Clough v. Richelo*, 274 Ga. App. 129, 132 (1) (616 SE2d 888) (2005) (holding that a lawyer is a necessary witness where "the lawyer's testimony is relevant to disputed, material questions of fact and [where] there is no other evidence available to prove those facts"). The lawyers stated at the hearing that they would prefer to withdraw that claim if the presiding judge was "inclined" to grant the motion to disqualify them. However, the statement was conditional in nature rather than being an actual

---

[9] The presiding judge did not have the benefit of knowing precisely what the original trial judge's testimony might be, but the parties assumed in their arguments to the presiding judge that she would deny having made the off-the-record promise alleged by Martin, and this assumption is buttressed by the fact that she did not disqualify herself from the case sua sponte for her own misconduct. Martin's motion to withdraw his guilty plea stated that two prosecutors were in the original trial judge's chambers when the alleged promise was made, but the prosecutors had no recollection of ever hearing any such matter discussed.

20

withdrawal of the claim. Upon inspection of the presiding judge's order and the remainder of the record, we conclude that the lawyers never obtained a ruling on whether withdrawing their claim would permit them to remain as counsel once the presiding judge's order made clear that their disqualification would be required if they were to serve as witnesses. See *Smith v. Baptiste*, 287 Ga. 23, 30 (694 SE2d 83) (2010) (holding that a party must "obtain a distinct ruling" on an issue in order to raise it on appeal). Furthermore, if the lawyers had actually attempted to withdraw the claim in order to preserve their role as Martin's advocates, the presiding judge would have had to further consider their disqualification in order to ensure that Martin was adequately represented, particularly after the lawyers had argued so stridently in favor of the strength of their claim and given the fact that, as the trial court noted, the post-sentencing procedural posture of the case would have allowed for an orderly consideration of *any* ineffective assistance claims that might have existed to date. See *Chapel v. State*, 264 Ga. 267, 270 (3) (c) (443 SE2d 271) (1994) ("Furthermore, this court has held that when faced with a 'serious potential for a post-trial claim of ineffectiveness' a trial court properly refused to allow the defendant to be represented by counsel of his choice." (citation omitted)). Second, and

21

similarly, it was clear that Martin's original lawyers' anticipated testimony concerned a matter being contested by the State. Third and finally, the fact that Martin would suffer some hardship by the disqualification of his original lawyers was properly considered against the "countervailing considerations of comparable weight" that would be involved without the application of the general protection to Martin embodied in the ethical rule. *Davis*, 261 Ga. at 222; *Martinez v. Hous. Auth. of DeKalb Cnty.*, 264 Ga. App. 282, 288 (5) (590 SE2d 245) (2003) ("In determining whether to disqualify counsel, the trial court should consider the particular facts of the case, balancing the need to ensure ethical conduct on the part of lawyers against the litigant's right to freely chosen counsel.").

We next consider the circumstances in which Martin's original lawyers were expected to be necessary witnesses. This Court has stated: "[T]here is 'conflict inherent in counsel's dual role as advocate and witness,' and for an attorney to act as both witness and advocate is a circumstance to be avoided. Rather, '[t]he practice of trial attorneys testifying is not approved by the courts except where made necessary by the circumstances of the case." *McLaughlin v. Payne*, 295 Ga. 609, 611 (761 SE2d 289) (2014) (citations omitted). See also

22

*Mobley v. State*, 265 Ga. 292, 299 (18) (b) (455 SE2d 61) (1995) (holding that, when counsel also serve as witnesses, they "are forced into ethical conflicts, their credibility is improperly placed in issue, and advocacy roles are impaired"); *Castell v. Kemp*, 254 Ga. 556, 557 (331 SE2d 528) (1985) (noting that a lawyer who serves as both witness and advocate "'becomes more easily impeachable for interest and thus may be a less effective witness'" and "'is in the unseemly and ineffective position of arguing his [or her] own credibility'" (citation omitted)); 81 Am. Jur. 2d § 220 (2015). One circumstance that must be weighed in deciding whether a lawyer may ethically serve as both witness and advocate is whether the matter is to be heard by a jury or a judge, and this factor obviously weighed against the disqualification of Martin's lawyers, because their testimony was to be before the presiding judge. Cf. *Clough*, 274 Ga. App. at 137 (2) ("[T]here is great potential for juror confusion about which role the lawyer is serving during trial."). However, certain matters to be considered by a judge rather than a jury are of such gravity and controversy that disqualification of a lawyer who will serve as a witness may be justified. See id. at 138 (2). This Court has recognized that a lawyer is more likely to act ethically in serving as both a witness and an advocate if his or her testimony

23

relates to merely formal matters, but this factor clearly did not weigh in Martin's favor, because the lawyers' anticipated testimony concerned a critical and disputed matter. See *Payne*, 295 Ga. at 611. A lawyer is more likely to be allowed to testify and remain as an advocate where the need for his or her testimony is unexpected or occurs when a change in counsel would be disruptive to the proceedings. See id. at 611 n.2; *Pulte Home Corp. v. Simerly*, 322 Ga. App. 699, 702-703 (746 SE2d 173) (2013) (holding that the trial court did not abuse its discretion by refusing to disqualify an attorney based on a matter not raised by the opposing party until "only weeks prior to trial"). Cf. *Clough*, 274 Ga. App. at 137-138 (2) (noting that a lawyer who will serve as a witness *at trial* may nevertheless continue to represent his or her client in *pretrial* proceedings); *Castell*, 254 Ga. 556 (holding that it would be improper for original trial counsel to raise the issue of his own alleged ineffectiveness in a post-trial habeas corpus case). A lawyer is also more likely to be allowed to serve as a witness and an advocate where his or her testimony concerns collateral matters heard outside the main trial, such as rebuttal testimony regarding a deal allegedly made by a prosecutor. See *Lance v. State*, 275 Ga. 11, 26 (36) (560 SE2d 663) (2002).

This case involved the extraordinary circumstance where the presiding

24

judge anticipated that he would have the duty to ensure the proper advocacy of Martin's original lawyers as they took turns questioning one another as witnesses, to ensure the proper advocacy of those lawyers as they argued in favor of their own credibility as witnesses on a crucial issue, and to assess the credibility of those lawyers as witnesses against the credibility of a superior court judge. In light of the foregoing discussion, we conclude that the presiding judge did not abuse his discretion in ruling, as part of his multi-faceted and somewhat disjointed order, that the relevant ethical rule justified the disqualification of Martin's original lawyers.[10] Cf. *Amadeo*, 259 Ga. at 471 (2)

---

[10] We note that the presiding judge, after invoking the purely ethical considerations that we discuss above, also invoked a Georgia statute in force at the time, OCGA § 24-9-25 (effective until Jan. 1, 2013), that the presiding judge viewed as prohibiting Martin's original lawyers from serving as witnesses under *any* circumstances, regardless of whether they continued to represent Martin. This statute had no bearing on the State's motion to disqualify Martin's original counsel, as the information that they had allegedly learned that was to be the subject of their testimony before the presiding judge was not learned from Martin himself. See id. (effective until Jan. 1, 2013) ("No attorney shall be competent or compellable to testify for or against his client to any matter or thing, the knowledge of which he may have *acquired from his client* by virtue of his employment as attorney or by reason of the anticipated employment of him as attorney." (emphasis supplied)); *Buffington v. McClelland*, 130 Ga. App. 460, 465 (3) (203 SE2d 575) (1973). Furthermore, even if the presiding judge had correctly concluded that the statute would have barred Martin's original counsel from serving as witnesses under *any* circumstances, we fail to see how that conclusion should have led to their disqualification based on their not being allowed to serve as *both* witnesses and advocates. We need not address this *additional* ruling in further detail, however, because we conclude that the application of the ethical rule cited by the presiding judge, which necessarily involved the exercise of the judge's discretion in determining whether that rule should be applied under Martin's circumstances, is sufficient to sustain the judge's final decision on the issue of the disqualification of Martin's original lawyers.

25

("[U]nder the facts of this case, the considerations favoring the appointment of Amadeo's previous counsel *clearly outweighed* any opposing consideration, including the desirability of involving local lawyers. Therefore the trial court's refusal to appoint them amounted to an abuse of discretion." (emphasis supplied)).

3. Martin claims that the trial court erred by failing to grant his motion to declare Georgia's death penalty statutes unconstitutional. Martin forfeited this issue for ordinary appellate review by failing to obtain a ruling on his motion. See *Walker v. State*, 282 Ga. 774, 775 (1) (653 SE2d 439) (2007) (addressing the waiver arising from the failure to obtain a ruling in the trial court), overruled on other grounds by *Ledford v. State*, 289 Ga. 70, 85 (14) (709 SE2d 239) (2011). See also Division 6 (d) below. Furthermore, even pretermitting this forfeiture, we hold that Martin's arguments lack merit for the reasons set forth below.

(a) Contrary to Martin's argument, Georgia's death penalty statutes, particularly as applied under the proper jury instructions given in this case, do not fail to provide sufficient guidance to the jury in considering aggravating and mitigating circumstances and in considering a death sentence against a sentence

26

less than death.  See *Ellington v. State*, 292 Ga. 109, 116 (3) (a) (735 SE2d 736) (2012).

(b)  Martin's summary claim regarding "the discriminatory application of the death penalty against certain classes of people" is without merit, because he has not shown any invidious discrimination in his own case. See *Ledford*, 289 Ga. at 75 (3) (a).

(c) Georgia's death penalty statutes are not unconstitutional because they afford prosecutors the discretion to decide whether to seek the death penalty.  See *Ellington*, 292 Ga. at 116 (3) (b), 116 (3) (c); *Perkins v. State*, 269 Ga. 791, 794 (2) (505 SE2d 16) (1998).  See also *Crowe v. Terry*, 426 FSupp.2d 1310, 1354-1356 (VI) (2) (N.D. Ga. 2005).

(d) This Court's application of the proportionality review mandated by OCGA § 17-10-35 (c) (3) is not unconstitutional.  See *Ellington*, 292 Ga. at 117 (3) (e).

*Jury Selection Issues*

4.  Martin argues that the trial court erred by excusing one prospective juror and by refusing to excuse two prospective jurors based on their views on the death penalty.  We have summarized our review of a trial court's decisions

27

regarding juror qualifications based on their sentencing views as follows:

> Because a defendant is entitled to a full panel of qualified jurors at the beginning of peremptory strikes, "the erroneous qualifying of a single juror for the panel from which the jury was struck" would require reversal. *Lance v. State*, 275 Ga. 11, 15 (8) (560 SE2d 663) (2002). A juror who favors the death penalty must be excused for cause if those views "would prevent or substantially impair the performance of the juror's duties as a juror in accordance with the instructions given the juror and the oath taken by the juror." Id. (citing *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997)). We also apply this same standard where a juror is challenged based on his or her willingness to consider life with the possibility of parole and life without the possibility of parole. See id. at 16. In reviewing challenges to jurors based on their views on sentencing, we give deference to the trial court's findings. See id. at 15-16.

*Rice v. State*, 292 Ga. 191, 194-195 (3) (733 SE2d 755) (2012).

(a) Juror Neidert confirmed in her voir dire that she had stated in her jury questionnaire that, based on her Catholic faith, she did not believe that it was right to send someone to death. She stated that she still felt that way, that she "would feel much more comfortable" imposing a non-death sentence, that she could not pick a death sentence and could not consider one, that she was "struggl[ing]" in saying that she could impose a death sentence and did not know if she could do so, that sitting in voir dire she "really c[ould not] make that decision" to end someone's life, that she was not sure whether she might

28

change her mind on the matter, and that she believed "very strongly" that she could not change her views without changing her religious beliefs. She then stated: "I would have to say I could consider all three options, but I could sit here and also tell you I would struggle with that decision." When asked if she would keep an open mind and decide based on the facts of the case, she stated: "And my belief tells me I don't have the right to put someone to death. Now, the Bible also tells us, too, that we have to obey the law and we have to do what's right. So, I can't – I just can't. I can't sit here and tell you I will be able to make that decision, based on the information I have." When asked again if she would decide based on the facts, she stated: "Facts and circumstances. But, then, also too, based on my background and understanding of the law and, you know, my religious beliefs. So, yes, all that is going to come into play. I don't separate them." When asked if she could possibly consider all three options in light of the facts, she stated, "Possibly." The trial court did not abuse its discretion by excusing her.

(b) Juror Powers stated that she would consider all three sentencing options but would have difficulty imposing life with the possibility of parole. After the process was explained to her, she stated repeatedly that she would

listen to all of the evidence and consider all three options. She stated that, upon a conviction for murder, she would have "probably already decided" that death was the most appropriate sentence. She volunteered that she "probably would" have voted for a death sentence in a previous, high-profile case in Georgia that she named. She then stated that she would not be closed to the other options in Martin's case but that it would "[p]robably" be extremely difficult for her to consider the non-death options. When the trial court informed her that there were many kinds of murder cases and asked if she could keep an open mind, she stated: "I really don't know. I mean, I would like to think I could, but I don't know." Finally, after being reminded that she did not know any details about the case yet and being asked if she could listen to all the evidence and "choose one of those three options," she stated: "Like I said, I would like to think I could, yes. I would like to think that, yes, I could listen to the evidence and choose get [sic] other than death." The trial court did not abuse its discretion by refusing to excuse her.

(c) Juror Bathael stated repeatedly that she would listen to all of the evidence and consider all three sentencing options. Although she then stated that she would automatically vote for a death sentence for a deliberate homicide,

30

she later stated that she would "have to hear the evidence" before giving a death sentence based simply on guilt, that she did not already think that Martin should be sentenced to death, that she would withhold judgment until hearing the evidence, and that she would be willing to consider all three options. When asked if she was having trouble understanding questions, she stated, "Not really." After a detailed question outlining the trial process, she confirmed that she would wait to reach a decision until hearing all of the evidence and that she could fairly consider all three options. Finally, when asked by defense counsel again if she would automatically impose a death sentence, she stated, "No." The trial court did not abuse its discretion by refusing to excuse her.

5. Martin argues that the trial court erred in denying a motion to prevent the excusing of prospective jurors for cause based on any of their death penalty views that were derived from their religious convictions. This issue has been forfeited for purposes of ordinary appellate review because it was never raised or ruled upon below. See *Walker*, 282 Ga. at 775 (1) (addressing the waiver arising from the failure to obtain a ruling in the trial court), overruled on other grounds by *Ledford*, 289 Ga. at 85 (14); *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992) (addressing the waiver arising from the failure to raise

31

an issue in the trial court). See also Division 6 (d) below. Furthermore, even pretermitting this forfeiture, Martin's claim lacks merit. See *Brockman v. State*, 292 Ga. 707, 719 (7) (d) (739 SE2d 332) (2013).

*Guilt/Innocence Phase Issues*

6.    (a)  Martin argues that the trial court's charge on the verdict of guilty but mentally ill was improper. The trial court gave the jury charge mandated by statute:

> I charge you that[,] should you find the defendant guilty but mentally ill at the time of the crime, the defendant will be placed in the custody of the Department of Corrections which will have the responsibility for the evaluation and treatment of the mental health needs of the defendant which may include, at the discretion of the Department of Correction's [sic], a referral for temporary hospitalization at a facility operated by the Department of Human Resources.

See OCGA § 17-7-131 (b) (3) (B). See also Ga. L. 2009, p. 453, §§ 3-2 and 4-1 (amending OCGA § 17-7-131, effective July 1, 2009, to replace "Department of Human Resources" with "Department of Behavioral Health and Developmental Disabilities"). This charge also tracked the pattern jury charge in effect at the time. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 3.80.40 (2007) (as updated in January of 2009). However, the

*current* pattern jury charge notes that the old charge "may be misleading in a death penalty case" and provides the following additional language:

> I charge you that should you find the defendant guilty but mentally ill at the time of the crime, *this case would still go forward to the Penalty Phase* where the jury would address the three possible punishment options of life, life without parole, or the death penalty.

See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 3.80.40 (2007) (as updated in July of 2015) (emphasis supplied).

(b) Because Martin did not object to the charge as given by the trial court, the charge should be reviewed for purposes of ordinary appellate review only under the "plain error" standard. See OCGA § 17-8-58 (b) ("Failure to object [to a jury charge] shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties.").[11] This Court has adopted the following test for "plain error":

---

[11] A form of "plain error" review is also applied where a trial judge has expressed an opinion on the evidence or guilt or innocence but no objection was raised at trial. See *Ledford*, 289 Ga. at 84-85 (14). But see Ga. L. 2015, p. 1050, § 1 (amending OCGA § 17-8-57). However, that form of review is not at issue here. We also do not address here the form of "plain error" review that would apply to evidentiary rulings under the new evidence code, which took effect on January 1, 2013. See *Ross v. State*, 296 Ga. 636, 639 n.6 (769 SE2d 43) (2015) (discussing OCGA § 24-1-103 (d) ("Nothing in this Code section [relating to rulings regarding the admission of evidence] shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.")).

First, there must be an error or defect – some sort of "[d]eviation from a legal rule" – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the [trial] court proceedings." Fourth and finally, if the above three prongs are satisfied, the [appellate court] has the discretion to remedy the error – discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

*State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (quoting *Puckett v. United States*, 556 U. S. 129, 135 (II) (129 SCt 1423, 173 LE2d 266) (2009) (citations omitted)).

This Court has held that the jury charge prescribed by OCGA § 17-7-131 (b) (3) (B) is designed "to ensure that the jury understands that a verdict of guilty but mentally ill does not mean that the defendant will be released." *Spraggins v. State*, 258 Ga. 32, 34 (3) (364 SE2d 861) (1988). However, the trial court gave the statutory charge, and the jury was clearly not misled into thinking that a verdict of guilty but mentally ill would result in Martin's release. We approve of the additional language now included in the pattern jury charges,

but we conclude that the trial court's failure to include it sua sponte was not "clear or obvious" error and did not "affect[ Martin's] substantial rights" such that it "affected the outcome" of either phase of his trial. *Kelly*, 290 Ga. at 33 (2) (a) (citation and punctuation omitted).

(c) This Court has also applied a form of "plain error" review in direct appeals in death penalty cases. This review has been applied where an objection was raised in the trial court but the issue was not timely raised on appeal. See *Lynd v. State*, 262 Ga. 58, 61 n.2 (8) (414 SE2d 5) (1992). This review of matters that *were* objected to at trial but that *were not* raised in a timely fashion on appeal stems from the following portion of the Unified Appeal Procedure:

> The Supreme Court shall review each of the assertions of error timely raised by the defendant during the proceedings in the trial court regardless of whether an assertion of error was presented to the trial court by motion for new trial and regardless of whether error is enumerated in the Supreme Court. However, except in cases of plain error, assertions of error not raised on appeal shall be waived.

U.A.P. § IV (B) (2). See *Lynd*, 262 Ga. at 60 (8). We emphasize that this form of "plain error" review, like the "plain error" review under OCGA § 17-8-58 (b) discussed above, may result in appellate relief only in cases where an "error was

35

not affirmatively waived by the defendant, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Wells v. State*, 295 Ga. 161, 167 n.4 (3) (758 SE2d 598) (2014).[12]  This test for harm under plain error review is equivalent to the test in ineffective assistance of counsel cases for whether an attorney's deficient performance has resulted in prejudice of constitutional proportions. See *United States v. Rodriguez*, 398 F3d 1291, 1299-1300 (IV) (11th Cir. 2005).  That test requires a showing of "a reasonable probability that . . . the result of the proceeding would have been different," which is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U. S. 668, 694 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984).  However, this particular form of review does not apply here, because Martin did not object to the trial court's charge at trial.

(d)  In death penalty cases, in addition to reviewing potential errors that *were objected to* but that were not timely raised on appeal, this Court has

---

[12] In *Lynd*, 262 Ga. at 61 n.2 (8), we adopted the federal plain error test set forth in an Eleventh Circuit case, *United States v. Fuentes-Coba*, 738 F2d 1191, 1196 (III) (11th Cir. 1984), as setting forth the elements of plain error review.  In *Kelly* we explained that this federal plain error test had been refined since *Fuentes-Coba*, and we now utilize that four-part test.  See *Kelly*, 290 Ga. at 32-33 (2) (a).

also reviewed on appeal at least *some* potential errors that were *not objected to* at trial in order to determine if they affected the jury's selection of a death sentence. See *Gissendaner v. State*, 272 Ga. 704, 713-714 (10) (b) (532 SE2d 677) (2000). This form of review has been applied consistently to cases where the prosecutor made allegedly improper closing arguments in the sentencing phase that were not objected to at trial. In applying that form of review to a prosecutor's arguments, this Court has made clear that a similar review does *not* apply to ordinary criminal cases and does not even apply to the review of a jury's finding of guilt in a death penalty case. See id. This Court has also stated in several criminal appeals not involving the death penalty that this form of "plain error" review will be applied in death penalty cases to *other* types of alleged impropriety that have not been objected to at trial, and we re-affirm that view here. See *Durham v. State*, 292 Ga. 239, 240 (2) (734 SE2d 377) (2012); *Collier v. State*, 288 Ga. 756, 762-763 (1) (b) (707 SE2d 102) (2011); *Sharp v. State*, 286 Ga. 799, 801 (2) (692 SE2d 325) (2010). This form of review in death penalty cases arises not from any ordinary appellate review principle; instead, it arises from the statutory mandate for this Court to ensure that no death sentence is "imposed under the influence of passion, prejudice, or any

37

other arbitrary factor." OCGA § 17-10-35 (c) (1). See *Gissendaner*, 272 Ga. at 714 (10) (b). Although we have invoked this form of review specifically regarding prosecutors' arguments not objected to at trial, *each* of our decisions affirming a death sentence has included a plenary review of the record for "passion, prejudice, or any other arbitrary factor." OCGA § 17-10-35 (c) (1). That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence. In this regard, this form of review is the same as the other forms of plain error review described above and therefore affords no basis for relief based on Martin's claim in this appeal regarding the trial court's charge on the effect of a verdict of guilty but mentally ill to which he failed to object at trial.

7. Martin argues that the prosecutor made several improper closing arguments in the guilt/innocence phase. As we discuss in detail below, Martin has forfeited his right to ordinary appellate review regarding each of these arguments. However, as explained above in Division 6 (d), we will consider the arguments that were actually improper to determine whether there is a reasonable probability that, had those improper arguments been addressed

38

adequately at trial, the jury would have returned a sentence less than death.  See

*Gissendaner*, 272 Ga. at 713-714 (10) (b) (reviewing arguments by a prosecutor

that were not objected to at trial *solely* for the purpose of determining if a death

sentence was imposed under the influence of passion, prejudice, or any other

arbitrary factor in violation of OCGA § 17-10-35 (c) (1)).  Applying this

standard as we explain below, we find no reversible error.

(a)  Martin argues that the prosecutor improperly commented on

Martin's exercising his right not to testify by stating to the jury:

> I watched you taking notes during the trial.  I watched you being
> attentive.  I watched you looking at the witnesses and judging their
> credibility.  *I watched [you] looking at both parties and the
> defendant in this case and judging credibility*, and I want to thank
> you for that attention that you paid.

(Emphasis supplied.)  Because Martin did not object to this portion of the

prosecutor's argument at trial, this claim has been forfeited for the purpose of

ordinary appellate review.  Furthermore, we conclude that the jury would not

have perceived this as a comment on Martin's failure to testify, and it therefore

was not improper.  See *LeMay v. State*, 265 Ga. 73, 75 (4) (453 SE2d 737)

(1995) ("Reversal for improper comment by the prosecutor requires a finding

either that 1) the prosecutor's manifest intention was to comment on the

accused's failure to testify, or 2) the remark was of such a character that a jury would naturally and necessarily take it to be a comment on the accused's failure to testify.").

(b) Martin complains that the prosecutor vouched for the credibility of the State's case by directing the jury's attention to the members of the prosecution team and stating:

> Their job is to seek the truth. I would be committing malpractice if I let you forget these people. I would turn my badge in if I let you forget these people. I would turn my badge in if I let you forget Savion Wright, if I let you forget Ila Ivery, if I let you forget Travis Ivery.

Martin raised this same objection at trial, and the trial court sustained it. Because Martin did not thereafter seek any further relief, the issue of the lack of any further action by the trial court has been forfeited for the purpose of ordinary appellate review.

Martin further argues that the argument quoted above was improper because it invoked sympathy for the victims in a manner that was inappropriate during the guilt/innocence phase. This claim has also been forfeited for the purpose of ordinary appellate review, because Martin did not raise it at trial.

Furthermore, we do not find the claim to have any merit. See *Davis v. State*, 285 Ga. 343, 344 (2) (676 SE2d 215) (2009).

Finally, Martin argues that the argument quoted above amounted to a violation of the "Golden Rule," which forbids any argument "that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position." *Braithwaite v. State*, 275 Ga. 884, 885 (2) (b) (572 SE2d 612) (2002). We find no violation of that rule here.

(c) Martin also complains regarding the following argument by the prosecutor:

> When you go back to that jury room, you are going to have – you are going to have this feeling in your stomach, right, because this is serious. That feeling you are having is compassion, okay. I don't want you to ignore it. I want you to embrace, feel it, and realize you are human, you have compassion. Then I want you to stop and think, that's what [Martin] didn't have on October 1st.

Even accepting Martin's argument that the "compassion" spoken of here referred to compassion for the victims and not for him, we nevertheless disagree with Martin's contention that this argument amounted to a violation of the "Golden Rule," because we do not find that it urged the jurors to "place themselves in a victim's position." Id. However, we do agree that it was

41

inappropriate in the guilt/innocence phase, because "compassion" for the victims should have played no part in the jury's decision regarding whether Martin was *guilty* of committing crimes against them. Cf. *Davis*, 285 Ga. at 344 (2). However, because Martin raised no objection to this argument at trial, it has been forfeited for the purpose of ordinary appellate review.

(d) Martin argues that the prosecutor's closing argument repeatedly misled the jury regarding the effect of a sentence of guilty but mentally ill. While it was not improper for the prosecutor to state that it would not be justice for the jury to impose a sentence of guilty but mentally ill if it was not supported by the evidence, we agree that it was improper to refer to such a verdict using the phrases, "a break" and "a pass," and by making similar arguments. We note, however, that such language *would* have been permissible in the sentencing phase where, regardless of whether the jury had found Martin guilty or guilty but mentally ill, the jury would be choosing between imposing a death sentence or granting mercy. See *Lewis v. State*, 279 Ga. 756, 764 (12) (620 SE2d 778) (2005) (holding that "the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict"). Because Martin did not object to this line of argument at trial, he has forfeited

42

his right to ordinary review of the matter on appeal.

(e) Upon our review of each of the arguments described above that we have not explicitly held to have been proper, we conclude, particularly in light of the overwhelming evidence and the nature of Martin's crimes, that the absence of those arguments would not in reasonable probability have resulted in a different sentencing verdict and therefore do not warrant relief under our special review of death sentences. See Division 6 (d) above.

*Sentencing Phase Issues*

8. Martin claims that the trial court erred by allowing victim impact testimony from Tymika Wright at his retrial in 2009 that was false, unsworn, and hearsay. For the reasons set forth below, we find no reversible error.

(a) During Martin's bench trial in 2005, the State presented to the trial court a typewritten document indicating Ms. Wright's anticipated victim impact testimony, and Martin indicated on the document what portions of that testimony he was objecting to by underlining them. At this point, the document and Martin's objections were being considered by the trial court as part of the pretrial hearing approved of in *Turner v. State*, 268 Ga. 213, 214-215 (2) (a) (486 SE2d 839) (1997) (commending a procedure whereby objections to victim

43

impact testimony can be raised pretrial).  The trial court deferred ruling on Martin's objections.  Ms. Wright then read from her written statement, omitting most but not all of the underlined portions.  Any error committed in the procedure followed at this 2005 bench trial is obviously moot in light of Martin's obtaining a new trial.

At Martin's retrial before a jury in 2009, which was after Ms. Wright's death, the State presented Ms. Wright's victim impact testimony by having the State's document containing her proposed testimony from 2005 read to the jury by her aunt rather than by having her prior testimony read from the official transcript of the 2005 trial or by playing an audio recording of that prior testimony.  In reading from the document, Ms. Wright's aunt omitted much of the material that had been marked as objectionable in 2005.  Martin raised no objection to the testimony as it was read or afterward.  On appeal, however, Martin argues that it was reversible error for the testimony at the 2009 trial to include two statements that had been marked on the document as objectionable by the defense during the 2005 trial but had never been ruled on.  The first statement was as follows:  "A person that would do this to people who loved him, would have to be a cold-hearted piece of waste of life with no soul."

However, we note that this first statement was followed by the following language, which *had* been read by Ms. Wright during her live testimony in 2005: "It is hard for me to think of Kelvin in that way, so I have to believe that if he had a second chance that night and did not use drugs or decide to stay where he was or if he was sober, we would not be here today. I have to believe that Kelvin loved us the best that he could, and I believe Kelvin is sorry for what he did because I just can't believe a human being could kill and have no reason." The second statement that Martin argues warrants reversal of his 2009 death sentences followed immediately afterward and was as follows: "My personal feelings are just that. Our family is destroyed and just scattered amongst the ruins. My beautiful Savion and our parents are the only precious memories that I can tell you, if they were here, they would only ask you to please, please not let this happen to another family."

(b) Martin first argues that the two statements quoted above that were read at his 2009 trial by Ms. Wright's aunt but were not read by Ms. Wright in her live testimony in 2005 amount to testimony that the prosecutor knew or should have known to be false. Specifically, Martin argues that the State incorrectly stated to the trial court in front of the jury that it was going to

45

have Ms. Wright's aunt "read [Ms. Wright's] statement" and that stating that falsely led the jury to believe that the statements actually read by Ms. Wright's aunt were truthful statements from Ms. Wright. Pretermitting Martin's argument that his failure to raise this particular claim at trial should not be deemed to have forfeited the claim for ordinary appellate purposes because the State misled the defense, we hold that the claim cannot prevail, because Martin has not shown that the written statements, which apparently were approved by Ms. Wright while she was alive, were actually false. See *Hall v. Lance*, 286 Ga. 365, 377 (III) (A) (687 SE2d 809) (2010) (citing *United States v. Agurs*, 427 U. S. 97, 103 (II) (96 SCt 2392, 49 LE2d 342)) (1976), and rejecting a claim where the trial testimony at issue was never shown to have been false).

(c) Martin further claims that the statements at issue constituted inadmissible hearsay and violated his rights to due process and his right to confront witnesses against him under the constitutions of Georgia and the United States. These claims were forfeited for ordinary appellate review by his failure to object at trial. Furthermore, applying the "plain error" review that we discuss in Division 6 (d) and that is applicable only to the review of death sentences, we conclude that the claim must fail because, particularly in light of

the overwhelming evidence and the nature of Martin's crimes, the absence of the contested statement would not in reasonable probability have changed the jury's decision to impose a death sentence. See *Gissendaner*, 272 Ga. at 713-714 (10) (b) (reviewing alleged impropriety that was not objected to at trial *solely* for the purpose of determining if a death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor in violation of OCGA § 17-10-35 (c) (1)).

9. In addition to his claim above regarding unsworn and allegedly false testimony, Martin argues that the trial court erred by permitting victim impact testimony that was improper in other ways. Because Martin failed to both raise objections and obtain rulings on them regarding any of the allegedly objectionable statements, he has forfeited his right to appeal under ordinary appellate review standards. See *Smith*, 287 Ga. at 30 (3) (holding that a party must "obtain a distinct ruling" on an issue in order to raise it on appeal). Furthermore, we conclude under the "plain error" review, which we discuss in Division 6 (d) and which we apply only to the review of death sentences, that none of the allegedly improper statements, even if assumed to have been objectionable, in reasonable probability led to the jury's imposition of the death

47

penalty. See *Gissendaner*, 272 Ga. at 713-714 (10) (b) (reviewing alleged impropriety that was not objected to at trial *solely* for the purpose of determining if a death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor in violation of OCGA § 17-10-35 (c) (1)).

We have long and consistently held that victim impact testimony in Georgia must not include witnesses' "characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Sermons v. State*, 262 Ga. 286, 287 (1) (417 SE2d 144) (1992) (punctuation and citation omitted). Explaining this holding, we have rejected an argument by the State that a victim's family members in a death penalty case may make personal comments on the nature of the defendant's crimes based on the evidence presented at trial. See *Bryant v. State*, 288 Ga. 876, 896-897 (15) (a) (708 SE2d 362) (2011). However, in Martin's case, one of the victim's family members who gave victim impact testimony, Tymika Wright, was a victim herself and an eyewitness to Martin's crimes. Under such circumstances, limited testimony regarding the witness's personal knowledge of the crimes is admissible under the following statute:

(b) In presenting such evidence, the victim, the family of the victim, or such other witness having personal knowledge of the impact of the crime on the victim, the victim's family, or the community shall, if applicable:

(1) Describe the nature of the offense.

OCGA § 17-10-1.2 (b). Nevertheless, we caution the trial courts that the statute, even aside from constitutional concerns, also provides that such testimony "shall be in the sole discretion of the judge and in any event shall be permitted only in such a manner and to such a degree as not to inflame or unduly prejudice the jury." OCGA § 17-10-1.2 (a) (2).

Applying the standards described above, we easily conclude, as the State should have itself before presenting such testimony, that it was improper for Rashidah Ivery to testify regarding the victims, who had allowed Martin into their home, that "this is the thanks they get, stabbed in the heart, chest, removal of a spleen, throats cut, plus leaving a knife in one of them." While all of this testimony, except for her slight exaggeration of the testimony of Ila Ivery's surgeon regarding her spleen, was supported by admissible evidence, the witness had no personal knowledge regarding these details of Martin's crimes and should not have testified regarding them. We further note, although not

raised by Martin in his brief, that it was improper for this witness to address one of her statements directly to Martin.

We take a different view of the victim impact testimony of Tymika Wright, who was both a victim and an eyewitness. Her victim impact testimony, as repeated from Martin's first trial with essential accuracy, contained the following:

> My mind is fully plagued with visions of Kelvin repeatedly stabbing mama, and she begged for Kelvin to stop and just let her die. And granddaddy's body just lying there as Kelvin pounces on top of him constantly mutilating his body, checking to see if there were any signs of life before stabbing him again. And the look of horror on Savion's face, and his cries of fear as he tried to get away from Kelvin. And Christian lying over his brother's body as Kelvin stands over them with a knife raised above his head.

This testimony largely paralleled Ms. Wright's testimony in the guilt innocence phase, and we find that the trial court, if asked to render a ruling on the matter, would not have abused its discretion by admitting it as victim impact testimony. We do agree with Martin, however, that it was improper for Ms. Wright to characterize the defendant by referring to him as " a cold-hearted piece of waste of life with no soul," by giving a personal opinion about Martin's state of mind by stating that he "made all those decisions that night," and by giving a personal

50

characterization of Martin's crimes by stating that he "declare[d] war" on her family.

Finally, we agree with Martin that some of the victim impact statements by Anicia Ivery-Tucker were improper in that they strayed from the core of proper victim impact testimony and, instead, referred to the family's desire for "justice," attempted to describe Martin's motive by stating that he exercised "poor judgment and character," and described Martin as having given "no mercy" to the victims.

Although, as we have explained, some of the testimony described above was objectionable, we hold, particularly in light of the overwhelming evidence and the nature of Martin's crimes, that there is no reasonable probability that the objectionable portions of the testimony led to the jury's decision to impose a death sentence. See Division 6 (d) above.

10. Martin claims that the prosecutor made two improper closing arguments in the sentencing phase. If we found either of the arguments improper, we would consider only whether there is a reasonable probability that they led to the jury's decision to impose a death sentence, because Martin failed to object to the arguments at trial. See *Gissendaner*, 272 Ga. at 713-714 (10) (b)

(reviewing arguments by a prosecutor that were not objected to at trial *solely* for the purpose of determining if a death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor in violation of OCGA § 17-10-35 (c) (1)).  However, we conclude that the arguments were not actually improper.

(a)  Martin first complains regarding the following argument:

> You know that the sentencing options that you have here today before you are life with the possibility of parole.  Actually, that's kind of insulting.  Because you know that, based upon the defendant's actions and the defendant's activities through a course of years, that life with the possibility of parole is unacceptable.  Even his own attorney told you when we started this on yesterday that it is really not even about life with the possibility of parole.  What you really are considering is life without the possibility of parole and death.  I submit to you, ladies and gentlemen of the jury, that life without the possibility of parole is not even an option for you.

Specifically, Martin argues that this argument would have misled the jurors into believing that there was only one option available for them to consider under the law.  We find that this argument simply urged the jury to conclude that the other options available to them under the law were "unacceptable" in light of the *evidence* and, therefore, that the argument could not have misled the jury,

particularly in light of the trial court's clear instructions to the jury on the matter that followed the parties' closing arguments. Cf. *Spraggins*, 258 Ga. at 34 (3).

(b) Martin next complains, quoting selectively from the transcript, regarding the following argument:

> You see, because you will hear, I anticipate, some evidence of remorse. I submit to you that during the course of this trial and during the course of all these proceedings and even from the witnesses, that this defendant has not shown any remorse. I anticipate that the defense might say something like, well, you heard Detective Daniel say when he first came in that he was sorry. Based upon the defendant's own actions and own words, I tell you to really look at that 'sorry' because his actions show you that he is not.

We find that the jury would have perceived this as a comment on the evidence that *was* presented at trial rather than as a comment on Martin's failure to testify, and, therefore, we conclude that the argument was not improper. See *LeMay*, 265 Ga. at 75 (4) ("Reversal for improper comment by the prosecutor requires a finding either that 1) the prosecutor's manifest intention was to comment on the accused's failure to testify, or 2) the remark was of such a character that a jury would naturally and necessarily take it to be a comment on the accused's failure to testify.").

11. Martin claims that the trial court's sentencing phase jury instructions and the sentencing phase jury verdict form allowed the jury to find statutory aggravating circumstances without necessarily finding their existence unanimously. This Court has long held that a "jury may not impose a death sentence unless it unanimously agrees upon at least one statutory aggravating circumstance beyond a reasonable doubt, and expresses this finding in writing." *Fugate v. State*, 263 Ga. 260, 263 (5) (c) (431 SE2d 104) (1993). See also *Ellington*, 292 Ga. at 117-118 (3) (d) (noting that Georgia law "require[s] the jury to find the existence of at least one statutory aggravating circumstance unanimously and beyond a reasonable doubt before a death sentence may be considered"). This time-honored holding now is also buttressed by the Constitution of the United States under *Ring v. Arizona*, 536 U. S. 584 (122 SCt 2428, 153 LE2d 556) (2002). However, as set forth below in more detail, we have no doubt, considering both the sentencing phase jury instructions and the sentencing phase verdict form, that the jury concluded unanimously regarding the existence of each of the statutory aggravating circumstances marked in its verdict. Accordingly, pretermitting the issues related to Martin's failure to

object at trial to the jury instructions, the verdict form itself, or the ultimate form

of the jury's verdict, we hold that Martin's claim must fail.

In its sentencing phase jury instructions, the trial court stated:

Under Georgia law, a sentence of death or life imprisonment without parole[13] shall not be imposed unless the jury finds beyond a reasonable doubt and designates in its verdict in writing at least one or more statutory aggravating circumstances. It may then fix the sentence of death or life imprisonment without parole in its verdict. It may also and always fix the sentence as life in prison with the possibility of parole.

The trial court later instructed the jury:

If you decide to impose the sentence of death, you would return a verdict that reads: We, the jury, find beyond a reasonable doubt that statutory aggravating circumstances or a circumstance do exist in this case. Then, you would set out in writing such aggravating circumstance or circumstances that you may find from the evidence in this case to exist beyond a reasonable doubt and upon which I have instructed you. Then, you would fix the sentence at death. If this were your verdict, then the defendant would be sentenced to be put to death in the manner provided by law.

The trial court continued later: "Your verdict as to the penalty must be

unanimous and it must be in writing, dated, and signed by your foreperson and

returned and read in open court." In concert, these three jury instructions made

---

[13] The requirement of a jury's finding a statutory aggravating circumstance in order to authorize a sentence of life without parole was removed on April 4, 2009. See Ga. Laws 2009, §§ 4 and 11.

sufficiently clear to the jury that it could only consider a death sentence if it reached a unanimous verdict that included a finding of one or more particular statutory aggravating circumstances. See *Sallie v. State*, 276 Ga. 506, 512 (9)(b) (578 SE2d 444) (2003) ("The trial court did not commit reversible error by not charging that a finding of a statutory aggravating circumstance must be unanimous since it did charge that the jury's verdict as to sentence must be unanimous."); *Lance*, 275 Ga. at 23 (24).

We also disagree with Martin's contention that the sentencing phase verdict form casts doubt on whether the jurors agreed unanimously regarding each of the particular statutory aggravating circumstances indicated in the verdict. At the beginning of the section of the verdict form that addresses statutory aggravating circumstances, the form reads: "We, the jury, unanimously find the existence of the following aggravating circumstance(s)." Regardless of the fact that the blank line next to this introductory phrase was left blank by the jury, we conclude that the jury's placing check marks on the blank lines next to the individual statutory aggravating circumstances listed after the introductory phrase, particularly in light of the trial court's instructions, clearly

indicated that a unanimous finding of each of those statutory aggravating circumstances was part of the jury's overall verdict.

12. Martin claims that the trial court erred by failing to instruct the jury in the sentencing phase that the instructions on voluntary intoxication that the trial court had given in the guilt/innocence phase did not apply in the sentencing phase. Pretermitting the issues related to Martin's failure to raise this objection at trial, we hold that the jurors would not have been misled regarding the proper role of Martin's evidence related to his intoxication as mitigating evidence. See *Palmer v. State*, 271 Ga. 234, 238 (6) (517 SE2d 502) (1999) (examining a challenged sentencing phase jury instruction in light of the charge as a whole and concluding that jury was not misled).

The relevant instructions in the guilt/innocence phase were as follows:

Alcoholism is not involuntary and is no defense to any criminal act. A person who knows that he suffers a chronic alcohol drinking problem or knows that he suffers from alcoholism may not intentionally and voluntarily induce or bring on a state of intoxication and then be excused from the commission of a criminal act during the voluntarily induced intoxicated state. Chronic drug use or drug abuse, like chronic alcoholism, is not involuntary under Georgia law. Voluntary intoxication which produces the onset of a mental illness, whether caused either by alcohol or drugs or both, can allow a jury to consider a possible verdict of guilty but mentally ill if the jury is satisfied that the defendant was in fact rendered

57

mentally ill at the time of the offense.

The instruction highlighted that alcoholism and chronic drug abuse do not negate the voluntariness of one's choosing to drink or take a drug, but it said nothing regarding whether that choice might be much more difficult for an alcoholic or a drug addict. The instruction next indicated that voluntary intoxication is not a "defense" to a crime. The instruction then ended with a reference to the specific guilt/innocence phase verdict of guilty but mentally ill, which we find irrelevant to our analysis here of any impact on the sentencing phase.

> In the sentencing phase, the trial court instructed the jury as follows:
>
> Mitigating or extenuating facts or circumstances are those that you, the jury, find do not constitute a justification or excuse for the offense in question but that, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame.

This instruction, unlike the guilt/innocence phase instruction addressing voluntary intoxication as an alleged "defense" to a criminal charge, clearly assumes that one is guilty of the criminal charge of murder. The instruction then makes clear that there may be "facts or circumstances" falling short of a defense, justification, or excuse warranting an acquittal that nevertheless might reduce

58

the "degree of moral blame" appropriately attached to that murder conviction, which is exactly what mitigating evidence is. The jury was further instructed to consider such mitigating evidence and that it could impose a life sentence in light of or even in the complete absence of such mitigating evidence. Thus, we conclude that the jury was well informed of its proper role in the sentencing phase and the proper role that mitigating evidence should serve.

13. Martin contends that the trial court erred by allowing the jury to consider the statutory aggravating circumstances concerning the commission of a rape during the commission of a murder. See OCGA § 17-10-30 (b) (2). As we have discussed in detail above in Division 1, the evidence presented in the guilt/innocence phase was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Martin was guilty of raping Tymika Wright. Because the evidence presented at the guilt/innocence phase is properly considered by the jury in its sentencing deliberations, this same evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the existence of the statutory aggravating circumstances concerning the commission of rape during the murders. See *Berryhill v. State*, 249 Ga. 442, 450-451 (11) (291 SE2d 685) (1982) (noting that the jury properly reconsiders all of the

59

evidence from the guilt/innocence phase in the sentencing phase). This same standard, which concerns the sufficiency of the evidence when reviewed on appeal, applies to Martin's claim here, which is essentially a claim that the trial court erred by not granting a directed verdict regarding the statutory aggravating circumstance at issue. See *Miller v. State*, 270 Ga. 741, 742 (1) (512 SE2d 272) (1999) (holding that the standard of review for the sufficiency of the evidence is the same as the standard for denying a motion for a directed verdict). Accordingly, we conclude that the trial court did not err by presenting the question to the jury of whether the murders of Savion Wright and Travis Ivery were committed during a rape.

14. Among the other statutory aggravating circumstances alleged in his case, Martin's jury was charged that it should consider whether the State had proven the statutory aggravating circumstances involving the fact that Savion Wright's murder was committed during the commission of Travis Ivery's murder and the fact that Travis Ivery's murder was committed during the commission of Savion Wright's murder. Martin argues that the trial court erred by allowing the jury to consider these two related statutory aggravating circumstances, which this Court has referred to as "mutually supporting

aggravating circumstances." The trial court did not err by submitting both of these statutory aggravating circumstances to the jury, and, even under this Court's rule that one of them should be set aside on appeal, Martin's two death sentences remain unaffected, because each death sentence remains supported by at least one remaining statutory aggravating circumstance. See *Tate v. State*, 287 Ga. 364, 368 (7) (695 SE2d 591) (2010) (citing *Zant v. Stephens*, 462 U. S. 862 (103 SCt 2733, 77 LE2d 235) (1983)); *Lance*, 275 Ga. at 23 (25).

15. Martin argues that the trial court's sentencing phase jury instructions on mitigating circumstances were improper in several ways. This matter has been waived for ordinary appellate purposes, because Martin *requested* these jury instructions, which were drawn from the pattern jury charges. See OCGA § 17-8-58 (applicable to trials occurring on or after July 1, 2007, and providing for "plain error" review where a jury charge was not objected to at trial); *Pena v. State*, 297 Ga. 418, 424 (6) (a) (774 SE2d 652) (2012) (holding that the "plain error" review provided for in OCGA § 17-8-58 is waived where the defendant "requested the charge in question and made no objection to the charge at trial"). However, pretermitting the question of the exact limits under these procedural circumstances of our special review of a jury's decision to impose a death

61

sentence, we have reviewed the sentencing phase instructions at issue here and conclude for the reasons set forth below that none of them was improper. See Division 6 (d) above. See also *Head v. Ferrell*, 274 Ga. 399, 403 (IV) (554 SE2d 155) (2001) (holding on *habeas corpus* that "[c]laims regarding sentencing phase jury charges in a death penalty case are never barred by procedural default"); *Tucker v. Kemp*, 256 Ga. 571, 573-574 (351 SE2d 196) (1987) (describing this Court review *on habeas corpus* of claims regarding sentencing phase jury instructions that were forfeited at trial); *Gissendaner*, 272 Ga. at 713-714 (10) (b) (reviewing arguments by a prosecutor that were not objected to at trial *solely* for the purpose of determining if a death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor in violation of OCGA § 17-10-35 (c) (1)).

(a) It was not improper to instruct the jury that it should consider both "mitigating" and "extenuating" circumstances, because those terms are "essentially synonymous" and because the jury is instructed to consider both of them together in determining a sentence. *Ellington*, 292 Ga. at 145 (11) (a).

(b) In light of the specific definition provided for mitigating and extenuating facts in the sentencing phase, the jury instruction would not have

been misleading when compared to the instruction on malice murder given in the guilt/innocence phase. See *Palmer*, 271 Ga. at 238 (6) (noting that a sentencing phase jury charge should be evaluated as a whole).

(c) The jury would not have been misled into believing that it could choose not to consider mitigating circumstances. Instead, the jury instructions clearly stated, "You *shall* consider the facts and circumstances, if any, in extenuation, mitigation, or aggravation of punishment." See id. (noting that a sentencing phase jury charge should be evaluated as a whole).

(d) The jury instruction regarding mitigating circumstances "d[id] not improperly require the jury to find that any mitigating evidence must be connected directly to the crime itself in order to be considered." Id. at 145-146 (b).

(e) The jury instructions would not have led any jurors to believe that they could consider any given mitigating circumstance only if the jury first found unanimously that that mitigating circumstance existed. Instead, the jury was instructed that it could impose a life sentence in its verdict even if it found *no* mitigating circumstances and that it could impose a life sentence for any reason or without any reason. See id. at 146 (11) (c).

63

16. Martin argues that his death sentences must be overturned based on the actions of a juror during the jury's sentencing phase deliberations. On her jury questionnaire, Juror Lemmond indicated that she had been employed by the Department of Corrections for 27 years. During her voir dire, she confirmed that she had been employed by the Department of Corrections, but the parties' questioning of her regarding that topic was limited to the impact that her past employment had had on her views regarding the death penalty. During her testimony at the hearing held on Martin's motion for a new trial, she testified that she had served in a number of positions with the Department of Corrections over the span of at least 27 years and that she had visited Georgia prisons frequently and was familiar with the layout of each of them. According to her testimony and the testimony of several other jurors, Juror Lemmond answered other jurors' questions during the jury's deliberations regarding the conditions that Martin might encounter if sentenced to imprisonment for life, such as whether Martin would be free to leave his cell, would be able to go outside, and would have exercise equipment, and she described what the cafeteria and medical facilities would be like. She told the other jurors that Martin would be housed in the general population, could eventually be moved to a dormitory, and

would be free to move among the various buildings for things such as food, medical care, and exercise. She also drew a diagram to illustrate the general layout of a particular high-security prison. Although it is not necessary to our resolution of this claim, we note that our review of the record does *not* support Martin's contention that Juror Lemmond's statements to the other jurors contradicted the testimony, given notably only under questioning by the State, from Martin's expert on prison life.

Martin argues that, by providing this information learned from her past employment, Juror Lemmond served as an unsworn witness, injecting extrajudicial information into the jury's deliberations. See *Turner v. Louisiana*, 379 U. S. 466, 472-473 (85 SCt 546, 13 LE2d 424) (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."). However, there is a distinction between a juror who provides actual evidence specifically about the defendant or his or her crime that was learned outside the courtroom and a juror whose past experiences and learning provide context and

insight that allow for the evidence and arguments made at trial to be thoroughly examined. We have held that it is improper for a juror to obtain information relevant to the defendant's case *during* the defendant's trial, but we have also held that jurors properly bring to deliberations knowledge that they obtained *prior* to the trial that facilitates the jury's assessment of the evidence presented at trial, such as knowledge regarding how the slide on a handgun works that allowed the jurors to assess the defendant's explanation of how the handgun in his case was fired. See *Watkins v. State*, 285 Ga. 355, 356-357 (1) (676 SE2d 196) (2009) ("This belief, however, was based on Juror Sivley's past experience with handguns, not any extra-judicial experimentation."). See also *Grotemeyer v. Hickman*, 393 F3d 871, 878-881 (9th Cir. 2004) (finding no impropriety where "the jury foreman, referring to her experience as a medical doctor, opined that [the defendant's] mental disorders caused him to commit his crime, and that he would receive treatment as part of a sentence"); *Meyer v. State*, 80 P3d 447, 459 (Nev. 2003) ("A juror who has specialized knowledge or expertise may convey their opinion based upon such knowledge to fellow jurors. The opinion, even if based upon information not admitted into evidence, is not extrinsic evidence and does not constitute juror misconduct."); *State v. Mann*, 39 P3d

66

124, 132 (II) (A) (2) (N.M. 2002) ("[J]urors may properly rely on their background, including professional and educational experience, in order to inform their deliberations."). Indeed, most jurors in most cases bring *some* previous knowledge to jury deliberations that helps the other jurors understand and evaluate the evidence and arguments presented by the parties at trial, and we find this to be part of the very nature of the constitutionally mandated trial by jury. Voir dire provides an appropriate forum to explore jurors' knowledge drawn from their past experiences, and, in fact, Martin became aware of Juror Lemmond's past employment through that process but apparently found her to be a satisfactory juror nevertheless. See *Grotemeyer*, 393 F3d at 878 ("Counsel ordinarily learn during voir dire what a veniremember does for a living, and use peremptory challenges to avoid jurors whose experience would give them excessive influence."). Having accepted Juror Lemmond as a juror, Martin cannot now complain that her knowledge drawn from her past employment assisted the other jurors in considering the evidence and arguments made by the parties at trial.

17. Martin claims that the verdict form used by the jury in imposing his death sentences improperly presented the elements of the statutory aggravating

67

circumstance concerning a murder that is "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." OCGA § 17-10-30 (b) (7). We find no reversible error.

Martin correctly argues that the (b) (7) statutory aggravating circumstance is a single circumstance comprised of two components, with the second component capable of being established in three ways. See *Carruthers v. State*, 272 Ga. 306, 311 (3) (b) (528 SE2d 217) (2000), overruled on other grounds by *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008). The first component is that a murder must be "outrageously or wantonly vile, horrible, or inhuman." The second component is that a murder must have "involved torture, depravity of mind, or an aggravated battery to the victim." The two components are joined into one circumstance by the phrase, "in that."

On Martin's sentencing phase verdict form, each of the statutory aggravating circumstances alleged was listed next to a blank line on which the jury could place a check mark to indicate that it had found that circumstance's existence. Among the other statutory aggravating circumstances alleged, the (b) (7) statutory circumstance was listed in its two component parts, one right after

68

the other. Each of the two component parts followed its own blank line, and the conjoining phrase, "in that," was omitted. Martin argues that this suggested to the jury that, by finding the existence of both of these component parts, they had actually found two separate statutory aggravating circumstance and that the jury would therefore give undue weight to statutory aggravating circumstances in its deliberations.

Pretermitting the issues related to Martin's failure to object to the jury form at trial, we hold that Martin's claim must fail because it misrepresents the role of statutory aggravating circumstances in Georgia law. In Georgia, unlike in other states commonly referred to as "weighing states," the statutory aggravating circumstances serve to limit and guide the jury's discretion in sentencing by allowing the jury to exercise that discretion only in cases where certain enumerated circumstances are first found to exist. Nevertheless, once *at least one* statutory aggravating circumstance is found, the jury may impose a death sentence or, *for any or no reason,* may impose a life sentence, and the addition of one or more *additional* statutory aggravating circumstances would have no impact on the jury's absolute discretion to impose a life sentence. Thus, although we agree with Martin that the two components of the (b) (7) statutory

69

aggravating circumstance were presented and found in two separate pieces rather than, more properly, as two parts of a unified whole joined together with the phrase, "in that," we find that the error was harmless.

*Sentence Review*

18. Upon our review of the record, we conclude that Martin's sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

19. In its sentencing verdict, the jury found beyond a reasonable doubt that Savion Wright's murder was committed while Martin was engaged in the commission of the rape of Tymika Wright, that it was committed while Martin was engaged in the aggravated battery of Ila Ivery, that it was committed while Martin was engaged in the murder of Travis Ivery, and that it was outrageously or wantonly vile, horrible, or inhuman in that it involved the torture of Savion Wright, depravity of mind, and the aggravated battery of Savion Wright. See OCGA § 17-10-30 (b) (2) and (b) (7). The jury found beyond a reasonable doubt that the murder of Travis Ivery was committed while Martin was engaged in the commission of the rape of Tymika Wright, that it was committed while Martin was engaged in the commission of the murder of Savion Wright, and that

70

it was committed while Martin was engaged in the aggravated battery of Ila Ivery. See OCGA § 17-10-30 (b) (2). Upon our review of the record, including the evidence of rape discussed above in Division 1, we conclude that the evidence at Martin's trial was sufficient to support the statutory aggravating circumstances found as to both murders. See OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); U.A.P. § IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence). See also *Ring*, 536 U. S. 584; *Jackson*, 443 U. S. 307.

20. Considering both the murders for which Martin has been sentenced to death and Martin as a defendant, we find that the death sentences imposed in his case were not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); *Gissendaner*, 272 Ga. at 716-717 (holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence is excessive per se or is substantially out of line). The cases cited in the Appendix support this conclusion, because each shows a jury's willingness to impose a death sentence for the commission of multiple

murders, whether committed in one or more than one transaction. See OCGA § 17-10-35 (e).

Judgment affirmed. All the Justices concur, except Hunstein and Nahmias, JJ., who concur in judgment only as to Division 2.

APPENDIX

*Rice v. State*, 292 Ga. 191 (733 SE2d 755) (2012); *Tate v. State*, 287 Ga. 364 (695 SE2d 591) (2010); *Humphreys v. State*, 287 Ga. 63 (694 SE2d 316) (2010); *Stinski v. State*, 286 Ga. 839 (691 SE2d 854) (2010); *O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Williams v. State*, 281 Ga. 87 (635 SE2d 146) (2006); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Riley v. State*, 278 Ga. 677 (604 SE2d 488) (2004); *Franks v. State*, 278 Ga. 246 (599 SE2d 134) (2004); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002), disapproved on unrelated grounds by *Patel v. State*, 282 Ga. 412, 413 n. 2 (651 SE2d 55) (2007); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Colwell v. State*, 273 Ga. 634 (544 SE2d 120) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Pace v. State*, 271 Ga. 829 (524 SE2d 490) (1999); *Cook v. State*, 270 Ga. 820 (514 SE2d 657) (1999); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (*1997*); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995).